RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0181p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

KELI DUNNICAN,

*Defendant-Appellant*.

No. 19-3092

─────────────────

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 1:18-cr-00144-1—John R. Adams, District Judge.

Decided and Filed: June 9, 2020

Before: SUTTON, BUSH, and READLER, Circuit Judges.

─────────────────

## COUNSEL

─────────────────

**ON BRIEF:** Kevin M. Cafferkey, Cleveland, Ohio, for Appellant. Matthew B. Kall, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee. Keli Dunnican, Bruceton Mills, West Virginia, pro se.

─────────────────

## OPINION

─────────────────

JOHN K. BUSH, Circuit Judge. Keli Dunnican appeals a judgment of conviction for the charges of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g) (Count I); possessing marijuana with the intent to distribute it, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(D) (Count II); and carrying a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c) (Count III). Dunnican argues that the district court plainly erred

in allowing the government to introduce under Federal Rule of Evidence 902(14) certain data extracted from his cellular telephone. He also contends that the district court abused its discretion in allowing the government to introduce under Federal Rule of Evidence 404(b) certain text messages from his cellular telephone, allowing Drug Enforcement Administration (DEA) Special Agent Shaun Moses to offer expert opinion testimony that the marijuana found in Dunnican's car appeared to be packaged for distribution, denying Dunnican's motion for judgment of acquittal, denying his motion for a new trial following the dismissal of a jury member, and imposing a 21-month upward variance on Dunnican's sentence.

Because we find no error in the district court's rejection of Dunnican's Rule 902(14) argument, and we determine that the district court did not abuse its discretion in its rulings related to his other arguments, we **AFFIRM** the district court's judgment in full.

## I.

### A. The Trial Evidence

Dunnican's conviction arose from a search of his car conducted by Ohio Adult Parole Authority (APA) officers while he was on parole. One condition of Dunnican's parole was that he consent to regular warrantless searches by APA officers. The search at issue was conducted at Dunnican's residence in East Cleveland, Ohio by APA Officers Miranda Polito and Jennifer Williamson.

Polito and Williamson arrived at Dunnican's residence shortly after noon on November 5, 2017 and observed that Dunnican's car was not in the driveway. Polito called Dunnican to ask where he was. Dunnican responded that he was on his way home and would be there soon. When he arrived, Dunnican parked his white Nissan sedan on the street, around 20-to-25 feet behind the officers' car. Dunnican then exited his car and walked towards his residence.

Polito found it suspicious that Dunnican had parked his car so far away from his residence, given that the driveway was open and accessible. Polito and Williamson also observed that Dunnican smelled like marijuana and alcohol, his eyes were glazed, and he seemed anxious or "fidgety." After some questioning by Polito, Dunnican admitted that he had

marijuana in his vehicle. Consequently, the officers placed Dunnican in custody, where they conducted a pat-down search and seized his car keys.

Polito and Williamson then searched Dunnican's car and discovered a small bag of marijuana, an electronic scale with residue, and two cellular telephones. In the car's trunk were two grocery bags. The first contained several individually-packaged Ziploc bags of marijuana, as well as bundles of U.S. currency wrapped in rubber bands; the second grocery bag contained a loaded firearm. When the officers asked Dunnican about the items seized, he responded that the car was not his. However, records from the Bureau of Motor Vehicles revealed that Dunnican was the lessee of the vehicle.

Upon taking custody of the evidence from the search, East Cleveland Police confirmed that the discovered firearm was loaded with fifteen rounds of ammunition. Additionally, after receiving consent from Dunnican's father, "Kelly" Dunnican, to search the residence, officers located a jar with more suspected marijuana in Dunnican's bedroom.

Dunnican was arrested and transported to Cuyahoga County Jail. During booking, officers discovered that he had $300 cash in his wallet.

Eric French, an Ohio Department of Rehabilitation and Corrections Officer, was assigned as the lead investigator in Dunnican's case. French was a member of the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) Gun Violence Task Force. He testified that the packages found in the trunk of Dunnican's car contained marijuana and weighed approximately one pound in total. French further testified that upon test-fire testing, the seized firearm was confirmed to be operational.[1] Also, and most significantly, French introduced recordings of four post-arrest telephone calls made by Dunnican:

> (1) Dunnican's first call was with his father, Kelly Dunnican, who told his son during this call that officers had located "homegrown" in the son's bedroom. (R.77: Notice, GX16, at 1:50). To this, Keli Dunnican responded: "they got the other stuff anyways, so . . . that ain't gonna hurt nothing." (GX16, at 2:03).

---

[1]Investigators determined that the firearm had originally been sold by a dealer in Connecticut. Before trial, Dunnican stipulated (1) that the firearm and ammunition were manufactured outside of Ohio, and (2) that he was prohibited from possessing them because of a previous felony conviction.

(2) In a second call, Dunnican told his father that although he was unconcerned about the officers locating marijuana, as it would only result in a misdemeanor charge, he worried that "the gun is a problem." (R.77: Notice, GX17, at 0:15). Dunnican also indicated that he had "the craziest luck in the world." (*Id.*, at 0.45). Relatedly, he surmised to his father that an individual named "Anthony" had been funneling information about him to law enforcement. (*Id*.). Responding to this, Kelly Dunnican questioned why his son had failed to "take care of business" prior to returning home. (*Id.*, at 2:00). Keli Dunnican explained that he did not have time, and that although he had attempted to return to the house via "the back way," the patrol officers had seen him. (*Id*.). Once spotted, according to Dunnican, he had tried to reach his father on the telephone to see if he could meet him to take the car Dunnican drove. Later in this same conversation, an unidentified individual joined the call, at which point Dunnican admitted to this individual and his father that the car was his. Dunnican then complained that the officers would search his phones.

(3) Dunnican's third call was with an unidentified individual. Dunnican stated that he did not believe he could be charged with carrying a concealed weapon, given that the firearm was found in the car's trunk, and not within his immediate possession. At this point, another unidentified individual joined the call. Responding directly to Dunnican's last statement, the individual remarked, "I wish you would've just gave me that s**t," to which Dunnican responded, "It was in the trunk." (R.77: Notice, GX18, at 4:05). Dunnican then declared that he "was about to go right to the house and put that s**t in there," but did not have enough time. (*Id*. at 4:15).

(4) In Dunnican's final phone call, an unidentified woman asked him why he had not given her "the s**t" to take home. (R.77: Notice, GX19, at 2:30). Dunnican responded that he did not expect the officers to search his car.

Dunnican also had text-message conversations, which French summarized in exhibits introduced into evidence. French testified that the text-message conversations were obtained through a multi-step extraction process, which involved French's receiving two of Dunnican's phones from the East Cleveland Police, obtaining a search warrant for their search, and then attempting to access the phone data. This latter step involved the assistance of a mobile-extraction technician, who tried to download the data from one phone into a comprehensive report. However, the security features of the second phone impeded the data's accessibility.

Prior to trial, the government filed notice that it intended to authenticate the evidence extracted from the first cellular telephone under Federal Rule of Evidence 902(14). Included in

the notice was a certification provided by ATF Special Agent Joshua Snyder, who possessed training and experience in mobile-device data extraction. Based on his background, Snyder certified the following: (1) that he extracted data from Dunnican's cellular telephone on March 25, 2018 through the use of specialized forensic software, which created an accurate and reliable duplication of the data; and (2) that the forensic software generated a "digital fingerprint" (otherwise known as a "hash"), which indicated that the extraction was successful, complete, and accurate. (R. 25-1: Certificate of Authenticity, PageID 76–77).

Notably, during the final pretrial hearings, Dunnican objected to neither the government's notice nor the proposed authentication method. Also, at trial, he did not raise an authenticity challenge to the data, arguing instead that the text-message summaries constituted hearsay. The government countered that the exhibits were admissible summaries of conversations between Dunnican and unidentified individuals that had been extracted from the forensic examiner's 11,038 page long report. Thereafter, the court overruled Dunnican's objection, thus allowing French to introduce the text-message summaries.[2]

French began by presenting two text-message summaries to establish Dunnican's ownership of the telephone at issue. The first, "Exhibit 22," revealed a text-message exchange between Dunnican and Polito on June 28, 2017. In that exchange, the two coordinated Polito's home inspection of Dunnican's residence. The second text-message exchange was between Dunnican and a contact named "LaRae Davis." In this exchange, Dunnican sent a photo of his white Nissan sedan, accompanied by a message stating: "A '15 Altima, thanks Lil Sis!" (R. 69: French Trans., PageID 726–27; R. 77: Notice, GX 35, PageID 1070).

The government then requested permission from the court to introduce additional text messages between Dunnican and others under Federal Rule of Evidence 404(b) in order to demonstrate Dunnican's intent to distribute.[3] Because the court determined there was sufficient evidence showing that Dunnican had sent the messages, it allowed introduction of additional text

---

[2]Until this appeal, Dunnican never challenged the authenticity of the data extracted from the first cellular phone.

[3]Prior to trial, the government offered notice to Dunnican of its plan to introduce relevant text messages to demonstrate Dunnican's intent to distribute marijuana, a required element under 21 U.S.C. § 841(a)(1).

messages for the government's stated purpose of showing Dunnican's intent. However, at the time, the court refrained from weighing the probative value of the text messages against their prejudicial value under Rule 404(b).

The government's final witness was DEA Special Agent Shaun Moses, a thirteen-year narcotics investigator with extensive experience in Cleveland-area drug trafficking investigations.[4] The district court determined that Moses was a qualified witness regarding street-level drug trafficking, and therefore, qualified to provide opinion testimony regarding the facts at hand. Moses testified as to these matters:

(1) Drug Packaging: According to Moses, marijuana is typically sold in pounds, half-pounds, quarter-pounds, or ounces, and the street price varies based on quality. The bags of marijuana seized from Dunnican's trunk appeared to be quarter-pound bags, which sell, on average, for $200-to-$300 each. Furthermore, the way in which the bags were packed—in multiple Ziploc bags of approximately the same size, weight, and packing—was consistent with drugs packaged for distribution.

(2) Drug Paraphernalia: Moses observed that it is common for drug traffickers to fold their cash into bundles secured by rubber bands, as Dunnican had done, (*id.*, PageID 792), and it is "incredibly common" for drug traffickers to have electronic scales to weigh products for customers. (R.69: Moses Trans., PageID 792–93).

(3) Firearms: Moses testified that drug traffickers frequently use and keep firearms, generally with the objective of "protect[ing] themselves while conducting their drug sales." (*Id.*, PageID 793). Relatedly, handguns are considered more portable and concealable than other types of firearms, such as shotguns or rifles.

(4) Drug Slang: Moses noted that the terms used in Dunnican's text messages were consistent with language frequently used by dealers regarding different "grades," prices, and quantities of marijuana, as well as terms used generally to coordinate meeting spots to sell marijuana to customers. (*Id.*, PageID 795–802).[5]

---

[4]The government gave pre-trial notice to Dunnican that Moses would offer opinion testimony and a summary about the marijuana found in Dunnican's vehicle.

[5]Prior to allowing Moses's testimony regarding the specialized drug language used in Dunnican's text messages, the district court provided the jury with the following limiting instruction:

> With regard to the text messages, I'm allowing you to see them. You can consider them only as it relates to the government's claim on the defendant's intent.

> One of the issues in the case is whether the defendant intended to distribute the drugs in question. I'm allowing you to see the text messages for that purpose and that purpose only.

(R. 69: Moses Trans., PageID 794).

(5) <u>Overall assessment:</u> Moses cited the police reports, photographs, lab reports, and text messages relating to Dunnican's activity as suggesting that the marijuana was packaged for resale.

Based on the testimony of Moses and French, the district court concluded that the text messages were admissible under Rule 404(b), given that (1) the government presented sufficient evidence showing Dunnican had sent the text messages; (2) the government had shown the relevancy of the text messages in establishing Dunnican's intent to distribute; and (3) the probative value of the messages outweighed their prejudicial value.

At the close of the government's case, Dunnican moved for a judgment of acquittal on all counts, which the district court overruled.**[6]** Dunnican then presented his defense, calling only one witness, his father. Kelly Dunnican claimed that the firearm found in his son's car belonged to Kelly's deceased ex-wife. He also stated that he had placed the weapon in his son's trunk upon learning that a probation officer would be inspecting the residence. However, during cross-examination, Kelly Dunnican denied (1) that any probation officer had ever inspected his house before his son's release, and (2) that any probation officer had ever inquired whether there were firearms in his household. At the conclusion of his defense, Keli Dunnican did not renew his Rule 29 motion for judgment of acquittal.

In rebuttal, the government called Polito, Dunnican's probation officer. Contrary to Kelly Dunnican's claims, Polito stated that she had inspected the Dunnican residence, during which she inquired if there were any firearms in the home and was told by Keli Dunnican, Kelly Dunnican, and Kelly Dunnican's wife that there were none. Following the government's rebuttal, Keli Dunnican did not renew his Rule 29 motion for judgment of acquittal.

---

**[6]**At the conclusion of the government's presentation of its case, Dunnican objected to the admissibility of the text messages; however, he failed to challenge the authenticity of the messages, and he did not object to any other exhibits the government offered into evidence. As such, the district court overruled Dunnican's admissibility challenge.

**B. Juror 12**

Shortly after jury deliberations commenced, the district court was informed that Juror 12, the only African American juror, was being disruptive during the discussions. Upon hearing these complaints, the court immediately instructed the jury of its duty to deliberate.

Unfortunately, however, difficulties in jury deliberations continued. Forty–five minutes later, Juror 7 contacted the court "distraught" and "in tears." (R. 70: Trial Trans., PageID 955). After bringing the issue to the attention of the parties, the court decided to question each jury member individually. During this questioning the Foreperson claimed that instead of deliberating, Juror 12 was lamenting to her colleagues about "her neighborhoods, her plight as a black woman, [and] the shootings in her neighborhood." (*Id*., PageID 960, 966–67). According to Juror 7, no amount of coaxing could convince Juror 12 to re-focus on the facts of the case— even following the court's reminder to the jury of their duty to deliberate. After the court sent Juror 7 back to the jury room, it was reported that Juror 12 had just requested to be excused.

Thereafter, the court questioned Juror 12, who declared that although she had been deliberating, her colleagues had not done so. Juror 12 also informed the court that she was experiencing increased symptoms from her Crohn's disease, which she indicated was the result of racial tensions that had arisen during deliberations. (*Id.*) At this time, the court excused Juror 12 for medical reasons for the remainder of the day.

Following the questioning of Juror 12, the court advised the parties that it intended to continue its individual questioning of the jurors. However, Dunnican objected, asking the court to refrain from questioning any more jurors, given that Juror 12's illness could result in her permanent removal from the jury. The court agreed to end the questioning, and then excused the remaining jurors for the day.

Juror 12 failed to return the following day, and her mother contacted the court to request her daughter's release from continued jury duty, given that she reportedly had been in the emergency room the previous evening. Defense counsel initially agreed to the court's release of Juror 12 and did not make any objection that Juror 12 was the only African-American on the

panel.[7] The court then outlined its alternatives for going forward, which included either (1) replacing Juror 12 with an alternate; or (2) instructing the jury to continue deliberations with eleven jurors. At this point, Dunnican objected to Juror 12's removal. In light of the objection, the court contacted Juror 12 again, and was informed simply that Juror 12 was unable to come to court. The court then decided to adjourn deliberations again, leaving open the possibility that Juror 12 would return the following day.

The next day, the court made multiple unsuccessful attempts to contact Juror 12. The government then requested that Juror 12 be excused and replaced with an alternate pursuant to Federal Rule of Criminal Procedure 23(b)(3). Dunnican did not object to this request. His attorney agreed that the court had "taken reasonable steps under the circumstances," and that "its process [had] been well thought out." Defense counsel also admitted, "I don't know if there is any alternative that you can make at this point." (R. 72: Trial Trans., PageID 1003). Consequently, with the parties in agreement, the court replaced Juror 12 with an alternate, and instructed the jury to restart deliberations. Thereafter, the jury found Dunnican guilty of all three counts in the indictment.

At sentencing, the district court ordered Dunnican to serve an 84-month imprisonment term on Count 1; a 60-month imprisonment term on Count 2, to be served concurrently; and a mandatory 60-month imprisonment term on Count 3, to be served consecutively. This sentence varied upward a total of 21 months from the sentence calculated by the advisory U.S. Sentencing Guidelines.

**II.**

Dunnican argues that the district court abused its discretion by admitting into evidence under Federal Rule of Evidence 902(14) certain data that the government extracted from his cellular telephone. Specifically, he argues (1) the government inadequately authenticated the text messages; (2) the text messages constituted hearsay; and (3) the government's admission of

---

[7]The court did remind the parties that Juror 12 had reported her medical condition during *voir dire*. Juror 12 also submitted medical records to verify her condition, which are filed under seal in the record.

a summary of the text messages (as opposed to the forensic examiner's full report containing all of Dunnican's data) was improper.

In most cases, "[a] district court's evidentiary rulings will not be reversed absent a clear showing of abuse of discretion." *United States v. Damrah*, 412 F.3d 618, 625 (6th Cir. 2005) (citing *U.S. v. Hickey,* 917 F.2d 901, 904 (6th Cir. 1999)). "Abuses of discretion in evidentiary rulings . . . merit reversal only if the error is not harmless—'that is, only if the erroneous evidentiary ruling affected the outcome of the trial.'" *United States v. Farrad*, 895 F.3d 859, 875 (6th Cir.) (quoting *United States v. Marrero,* 651 F.3d 453, 471 (6th Cir. 2011)), *cert. denied*, 139 S. Ct. 651 (2018). Nonetheless, if a party fails to object, "his contention on appeal will prevail only if the trial court's evidentiary decision was plainly erroneous, thus affecting his substantial rights and resulting in a miscarriage of justice." *United States v. Evans*, 883 F.2d 496, 499 (6th Cir. 1989).

At trial, Dunnican never objected to the authenticity of the data extracted from his cellular phones, meaning, he failed to challenge the government's use of a Rule 902(14) certification to authenticate the forensic examiner's report. Consequently, Dunnican's authenticity claim on appeal is limited to plain-error review. However, because Dunnican objected to the extracted cell phone data on hearsay grounds, we review his appeal of this issue for abuse of discretion. *Damrah*, 412 F.3d at 628. And finally, because Dunnican did request that the court admit the forensic examiner's full, multi-thousand page report regarding his cellular phone usage, as opposed to simply summaries of such, we review that report's admission for abuse of discretion as well.

## A. Evidentiary Authenticity Challenge

Federal Rule of Evidence 901 governs the process of evidentiary authentication. It provides that "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." *See United States v. Jones*, 107 F.3d 1147, 1150 n.1 (6th Cir. 1997) (quoting Jack B. Weinstein et. al., *Weinstein's Evidence Manual*, ¶ 901(a) [01], at 901–19 (5th ed. 1996)) ("The [authentication] rule requires only that the court admit evidence if sufficient

proof has been introduced so that a reasonable juror could find in favor of authenticity or identification. The rest is up to the jury.")). "This task can be accomplished in a number of ways—with testimony from someone with knowledge of the evidence offered, for example, or by pointing to distinctive characteristics that establish authenticity." *Farrad*, 895 F.3d at 876; *see* Fed. R. Evid. 901(b)(1), (4). "Some items, however, 'are self-authenticating; they require no extrinsic evidence of authenticity in order to be admitted.'" *Farrad*, 895 F.3d at 876 (citing Fed. R. Evid. 902). One category of self-authenticating evidence is "[d]ata copied from an electronic device, storage medium, or file, if authenticated by a process of digital identification, as shown by a certification of a qualified person that complies with the certification requirements of Rule 902(11) or (12)." Fed. R. Evid. 902(14).

As explained by the Advisory Committee in 2017, there are critical convenience and efficiency objectives linked to the application of Rule 902(14):

> [T]he expense and inconvenience of producing an authenticating witness for this evidence is often unnecessary. It is often the case that a party goes to the expense of producing an authentication witness, and then the adversary either stipulates authenticity before the witness is called or fails to challenge the authentication testimony once it is presented.

Fed. R. Evid. 902, 2017 Advisory Committee notes. The Committee also notes that the amendment was intended to "provide[] a procedure in which the parties can determine in advance of trial whether a real challenge to authenticity will be made, and can then plan accordingly." *Id.*

The government adhered to these authentication procedures. In compliance with Rules 902(11) and 902(14), the government filed a notice of its intent to use a certification method on September 17, 2018. This certification was signed by ATF Special Agent Joshua Snyder, who performed the digital extraction. Snyder certified the reliability and verifiability of the extraction, which he explained, involved the use of a digital fingerprint generated by special software. Dunnican did not object to this method of self-authentication either during the final pretrial proceedings or at the trial.[8] Regardless though, because we determine that the

---

[8]Dunnican actually requested that the district court admit the *entire* extraction report—a document of several thousand pages in length—as opposed to summaries of such. The government argues that by virtue of this

stipulations of Rule 902 have been met and the evidence was properly authenticated, we conclude that the district court did not commit plain error in admitting it.

### B. Hearsay Challenge

Under Federal Rule of Evidence 801(c), "hearsay" is defined as statements that: "(1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." This definition leaves open a fairly wide category of statements that are not hearsay. *See* Fed. R. Evid. 801(d). Specifically, 801(d)(2)(A) provides that a statement is *not* hearsay if "[t]he statement is offered against an opposing party and . . . was made by the party in an individual or representative capacity[.]"

Based on the exclusion of Rule 801(d)(2)(A), Dunnican's text messages are not hearsay because they are Dunnican's *own* statements, regardless of the electronic medium through which they were sent. We have suggested as much in *United States v. Beckman*, 624 F. App'x 909 (6th Cir. 2015). There, we determined that a defendant's electronic instant messages were not hearsay, but rather constituted "admissions" under Rule 801(d)(2)(A). *Id.* at 913. Relatedly, we concluded that the district court properly admitted portions of the electronic conversations connected to unidentified parties who conversed with the defendant in order "to provide context to [that party's] own statements. *Id.*; *see also United States v. Henderson,* 626 F. 3d 326, 336–37 (6th Cir. 2010) (characterizing statements made by defendant during recorded telephone conversations as non-hearsay admissions under Rule 801(d)(2)(A) and concluding the admission of statements made by unidentified participants in the phone call were not to show the truth of the matter asserted, but to provide context for defendant's admissions). Similarly here, we conclude that the district court did not abuse its discretion in admitting Dunnican's text-message conversations into evidence.

### C. Challenge to Exhibit Summaries

It is often the case that "admission of summaries of voluminous books, records, or documents offers the only practicable means of making their contents available to judge and

---

request, Dunnican waived any challenge to the admission of portions of the extraction report. We need not address that argument, given our primary determination that the evidence was properly authenticated.

jury." Fed. R. Evid. 1006, 2011 Advisory Committee notes. Consequently, Federal Rule of Evidence 1006 offers parties the ability to "use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." Fed. R. Evid. 1006. Yet, the rule is not absolute. "The proponent must make the originals or duplicates [of summary exhibits] available for examination or copying, or both, by other parties at a reasonable time and place. And the court may order the proponent to produce them in court." *Id.*

The government complied with Rule 1006 when it presented the data extracted from Dunnican's cellular phone in summary form. In fact, it appears that Rule 1006 was designed to govern this exact scenario: where, upon downloading the contents of Dunnican's cellular telephone, the forensic examiner possessed over 11,038 pages of potential evidence—a number so unwieldy and robust that it would take multiple months (possibly, even years) for a court to examine all of this content. *See* Fed. R. Evid. 1006. Because these summaries were sufficiently authenticated by the forensic examiner and the government in a transparent fashion, we conclude that Dunnican's rights were safeguarded, as necessitated by Rule 1006. Therefore, the exhibit summaries were properly admitted.

**III.**

Next, relying on Federal Rule of Evidence 404(b), Dunnican appeals the district court's admission of certain text messages from his cellular telephone, purportedly to show Dunnican's intent to distribute the marijuana. Dunnican argues that the government's "purpose" was merely pretext. Instead, he contends, the text messages were introduced for the impermissible purpose of showing his character or propensity to commit other bad acts. Dunnican also insists that the text messages were not authenticated.

"We review a district court's ruling on the admissibility of evidence for abuse of discretion." *United States v. Yu Qin*, 688 F.3d 257, 261 (6th Cir. 2012); *see also United States v. Haywood,* 280 F.3d 715, 720 (6th Cir. 2002). An abuse of discretion has been committed if we are "left with the definite and firm conviction that the district court committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." *Yu Qin*, 688 F.3d

at 261 (quoting *United States v. Jenkins,* 345 F.3d 928, 936 (6th Cir. 2003)). Nonetheless, "[a] trial judge is accorded broad discretion in determining the admissibility of bad acts evidence under Rule 404(b)." *Yu Qin*, 688 F.3d at 261 (citing *United States v. Stout*, 509 F.3d 796, 799 (6th Cir. 2007)).

Rule 404(b)(1) states as follows: "Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character . . . ." Fed. R. Evid. 404(b)(1). However, Rule 404(b)(2) qualifies this provision, allowing the admissibility of evidence "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). There is a three-step process for assessing the admissibility of proof under Rule 404(b):

> *First,* the district court must decide whether there is sufficient evidence that the other act in question actually occurred. *Second,* if so, the district court must decide whether the evidence of the other act is probative of a material issue other than character. *Third,* if the evidence is probative of a material issue other than character, the district court must decide whether the probative value of the evidence is substantially outweighed by its potential prejudicial effect.

*Yu Qin*, 688 F.3d at 262 (quoting *Jenkins,* 345 F.3d at 937 (6th Cir. 2012)).

We have "repeatedly recognized that prior drug-distribution evidence is admissible [under Rule 404(b)] to show intent to distribute." *United States v. Ayoub*, 498 F.3d 532, 548 (6th Cir. 2007) (citing *Jenkins*, 345 F.3d 928, 938 (6th Cir. 2003) (collecting cases)). And, we view Rule 404(b) as "a rule of inclusion rather than exclusion." *United States v. Blankenship*, 775 F.2d 735, 739 (6th Cir. 1985); *United States v. Myers*, 102 F.3d 227, 234 (6th Cir. 1996).

Because Dunnican was charged with possessing marijuana with the intent to distribute it, the government's introduction of text messages regarding his other drug transactions was relevant to show a *necessary* element of the charge: Dunnican's *intent* to distribute the illegal drug. Before presenting these text messages, the government adhered to proper protocol under Rule 404(b) and our precedent—namely, the government (1) gave pretrial notice that it intended to introduce the text messages to show Dunnican's intent to distribute; and (2) presented evidence establishing Dunnican's ownership over the telephone at issue (*i.e.*, that the phone was

seized from Dunnican's vehicle, and that, during jail calls, Dunnican complained to an unidentified party about the phone's seizure). In admitting the text messages under Rule 404(b), the district court determined that the government (1) had demonstrated sufficient evidence to show that Dunnican had sent the messages; and (2) was introducing the messages for the proper purpose of showing that his possession of the marijuana was with the *intent* of distributing it. The court further determined that the probative value of the text messages outweighed any unfair prejudice to Dunnican. Also, the court imposed safeguards to Dunnican's case by instructing the jury twice (after the testimony of Moses and during the final jury instructions) that they could consider the text messages only as evidence of whether Dunnican had the intent to distribute marijuana—and not for any other purpose.

Dunnican argues that the span of time separating the period when the text messages were sent (from June 4, 2017 to October 21, 2017) and the occurrence of his charged conduct (November 8, 2017) destroys the messages' value in demonstrating his intent for the crime at hand. We disagree. Generally, prior acts evidence "must be relevant to a matter at issue and must be substantially similar to, and near in time to, the offense charged in the indictment." *United States v. Ismail*, 756 F.2d 1253, 1259 (6th Cir. 1985). But, there is not an "absolute maximum" amount of time that will bar admission of a separate act. *Id.* We have even upheld the admission of substantially older evidence of intent in a drug trafficking prosecution under Rule 404(b). *See United States v. Love*, 254 F. App'x 511, 516 (6th Cir. 2007); *United States v. Persinger*, 83 F. App'x. 55, 59 (6th Cir. 2003). The time periods at issue in *Love* and *Persinger* (both, approximately eight-year spans) were much longer than the relatively short span of time— a gap of 5 months and 9 days—separating Dunnican's sending of the text messages and his charged conduct.

Finally, the district court did not abuse its discretion in determining that the probative value of the text-message evidence substantially outweighed its potential prejudicial effect under Federal Rule of Evidence 403. Dunnican disputed both the possession and specific intent elements of the § 841(a)(1) charge. The text-message evidence, therefore, was relevant to show that (1) Dunnican had possessed marijuana, and (2) he had distributed that marijuana to customers during the days and weeks before November 8, 2017—facts that indicated a pattern of

Dunnican's *intent* to distribute. This pattern, in turn, would inform the jury's determination of his intent to distribute drugs here.

Dunnican argues that the district court should have excluded evidence under Rule 403 based on *United States v. Johnson*, 27 F.3d 1186, 1193 (6th Cir. 1994), but that case is inapposite. In *Johnson*, a cocaine distribution case, we noted our concerns with the district court's failures (1) to clearly identify the government's proper purpose for admitting the evidence and (2) to provide a clear limiting instruction to the jury regarding how to consider such evidence. *Id.* at 1193–94. Neither of these issues is present in this appeal. First, unlike in *Johnson*, the district court here clearly identified the government's purpose in offering the text messages under Rule 404(b)—to show Dunnican's intent to distribute marijuana. Second, also unlike in *Johnson*, the district court here gave the jury clear and consistent limiting instructions on *two* occasions prior to the jury deliberations. Therefore, we conclude that the district court did not abuse its discretion when admitting the text-message evidence.

## IV.

Dunnican also argues that the district court erred in admitting the expert-opinion testimony of DEA Special Agent Moses, who spoke regarding the particulars of the illegal marijuana trade and explained specialized drug jargon and transactions. "The question of admissibility of expert testimony is reviewed for an abuse of discretion." *United States v. Harris*, 192 F.3d 580, 588 (6th Cir. 1999); *see General Electric Co. v. Joiner*, 522 U.S. 136, 139 (1997).

Expert testimony regarding the very specific slang, street language, and jargon used in the illegal drug trafficking trade may be admitted under Federal Rule of Evidence 702. *See United States v. Kilpatrick*, 798 F.3d 365, 379–81 (6th Cir. 2015); *Harris*, 192 F.3d at 588–89. Because such expert testimony is required for both judges and juries to make rational determinations of a defendant's culpability, "[c]ourts have overwhelmingly found police officers' expert testimony admissible where it will aid the jury's understanding of an area, such as drug dealing, *not within the experience of the average juror*." *United States v. Thomas*, 74 F.3d 676, 682 (6th Cir. 1996), *abrogated on other grounds by United States v. Barron*, 940

F.3d 903, 920 (6th Cir. 2019) (emphasis added); *see also United States v. Lopez-Medina*, 461 F.3d 724, 742 (6th Cir. 2006).

Although Dunnican concedes that Moses possessed the requisite qualifications to provide testimony regarding drug jargon and transactions, he claims that Moses misinterpreted the record, and therefore, offered an opinion on Dunnican's mental state—a violation of Federal Rule of Evidence 704(b). The pertinent portion of this Rule provides that "[i]n a criminal case, an expert witness must not state an opinion about whether a defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense." Moreover, "[l]aw enforcement officers may testify concerning the methods and techniques employed in an area of criminal activity and to establish 'modus operandi' of particular crimes." *United States v. Pearce,* 912 F.2d 159, 163 (6th Cir. 1990). Nonetheless, "Rule 704(b) . . . prevents an expert witness from testifying that a defendant in a criminal case did or did not have the requisite mental state or condition constituting an element of the crime charged, as ultimate issues are matters for the trier of fact." *United States v. Combs*, 369 F.3d 925, 940 (6th Cir. 2004); *see also United States v. Watson,* 260 F.3d 301, 309 (3d Cir. 2001) ("Rule 704(b) may be violated when the prosecutor's question is plainly designed to elicit the expert's testimony about the mental state of the defendant, or when the expert triggers the application of Rule 704(b) by directly referring to the defendant's intent, mental state, or mens rea.") (citations and quotations omitted)). Therefore, we must ask "whether the expert actually referred to the intent of the defendant or, instead, simply described in general terms the common practices of those who clearly do possess the requisite intent, leaving unstated the inference that the defendant, having been caught engaging in more or less the same practices, also possessed the requisite intent." *Combs,* 369 F.3d at 940 (quoting *United States v. Frost,* 125 F.3d 346, 383–84 (6th Cir. 1997)).

A plain reading of the disputed testimony demonstrates that Moses offered no opinion on Dunnican's mental state or intent. Rather, Moses, drawing upon his training, experience, and review of the evidence, simply shared his subjective assessment of the facts at hand: that it "appear[ed] to [him]" that the marijuana discovered in Dunnican's car "was packed for resale." (R. 69: Moses Trans., PageID 801–02).

> Q.: So Agent Moses, based on your review of this case, looking at your experience working at the DEA, did you come to a conclusion about whether the marijuana taken out of the trunk was intended for distribution or whether it would have been intended for personal use?
>
> MR. DUFFRIN: Objection.
>
> THE COURT: It's overruled.
>
> THE WITNESS: I did. In my opinion, just based on the reports as I read them, the photographs, the lab reports and then the text messages, *it certainly appears to me that that marijuana was packaged for resale.*

(*Id.*) (emphasis added).

At no point did Moses state any opinion of Dunnican's state of mind. Rather, Moses merely offered "general terms" (*i.e.,* the "marijuana was packed for resale") related to the "common practices" of drug dealers "who possess the requisite intent" to distribute marijuana. *Combs*, 369 F.3d 940 (quotation omitted). Moses did not explicitly direct the jury to reach an improper conclusion. Therefore, any inference they drew regarding Dunnican's intent to "engage[] in more or less the same practices," was left unstated. *Id.*

Moses's testimony did not suffer from the infirmities of the agent's testimony we ruled invalid in *United States v. Freeman*, 730 F.3d 590, 597 (6th Cir. 2013). In *Freeman*, we deemed the challenged agent to be a *lay person* witness; therefore, we analyzed his testimony under Rule 701, not Rule 702. *Id.* However, even under a Rule 702 analysis, the testimony would have been problematic, because, as the government conceded up front, the agent "lacked the first-hand knowledge required to lay a sufficient foundation for his testimony." *Id.* The agent "repeatedly substantiated his responses and inferences with generic information and references to the investigation as a whole." *Id.* at 596. He also "spoon-fed his interpretations of the phone calls and the government's theory of the case to the jury, interpreting even ordinary English language." *Id.* at 597. We concluded that portions of his testimony were "[m]ere speculation," and that he "rel[ied] on hearsay evidence." *Id.* at 596.

In contrast with its treatment of the agent in *Freeman*, the government here laid a sufficient foundation for Moses to provide expert opinion, based on his extensive training and experience—a fact that Dunnican does not dispute. Also, unlike the witness in *Freeman*, Moses grounded his opinions in concrete, objective facts—his analysis of the "photographs," the "lab

reports," and the "text messages"—none of which constituted speculation or hearsay. *See United States v. Brown*, 7 F.3d 648, 653 (7th Cir. 1993) ("[The agent] based his opinion on his examination of the physical evidence itself, including the crack confiscated from [the defendant], and on the police reports of [the defendant's] arrest. These are precisely the types of evidence experts in the field of narcotics interdiction rely on to form their opinions."). Finally, unlike the prosecutor in *Freeman*, the government neither asked, nor led, Moses to offer legal conclusions, based on hypothetical questions that would result in his improper assessment of Dunnican's intent.

Accordingly, the district court did not abuse its discretion in admitting the testimony of Moses.

**V.**

Dunnican argues that the district court erred in denying his motion for acquittal pursuant to Federal Rule of Criminal Procedure 29. This Rule requires the district court, on the defendant's proper motion, to "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29. In determining whether Dunnican's conviction was supported by sufficient evidence, "we must view [that] evidence in the light most favorable to the government." *United States v. Faymore*, 736 F.2d 328, 334 (6th Cir. 1984) (citing *United States v. Glasser*, 315 U.S. 60, 62 (1942)).

However, Dunnican neither renewed his Rule 29 motion after presenting evidence, nor did he renew it after the government presented a rebuttal witness. He, therefore, is entitled to reversal of the district court's denial of his Rule 29 motion only if this ruling resulted in a "manifest miscarriage of justice." *See Faymore*, 736 F.2d at 334 ("Absent a manifest miscarriage of justice, we are unable to review the district court's denial of a Rule 29 Motion where the defendant did not renew that Motion at the close of all of the evidence."). In these circumstances, we may reverse the conviction only "if the record is 'devoid of evidence pointing to guilt.'" *United States v. Carnes*, 309 F.3d 950, 956 (6th Cir. 2002) (quoting *United States v. Abdullah*, 162 F.3d 897, 903 (6th Cir. 1998); *see United States v. Williams*, 940 F.2d 176, 180 (6th Cir. 1991).

Here, the government clearly has presented sufficient evidence of all of the elements of Dunnican's three charges. *See* 18 U.S.C. § 922(g); § 841(a)(1) and (b)(1)(D); § 924(c). First, Dunnican conceded that he was a convicted felon, and there was a firearm in the trunk of his car, which traveled in interstate commerce. Second, the government advanced sufficient evidence to show that Dunnican (1) knew the firearm was in his vehicle's trunk; (2) knew the marijuana also was in his car; (3) intended to distribute that marijuana; and (4) carried the firearm in order to protect his illegal drug-trafficking business. Based on this evidence, a reasonable jury could have found Dunnican guilty. Therefore, we affirm the district court's denial of Dunnican's motion for a judgment of acquittal. *See Faymore,* 736 F.2d at 334.

## VI.

We also hold that Dunnican was not entitled to a new trial, pursuant to Federal Rule of Criminal Procedure 33.[9] Rule 33 states that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." However, "[t]he decision whether to grant a new trial is left to the sound discretion of the district court, and this Court will not reverse absent a clear abuse of discretion." *United States v. Pierce*, 62 F.3d 818, 823 (6th Cir. 1995) (citation omitted). This standard applies even if the party's motion related to issues of alleged juror misconduct, as "'[t]he trial judge is in the best position to determine the nature of the alleged jury misconduct, and . . . to determine appropriate remedies for any demonstrated misconduct.'" *United States v. Wheaton*, 517 F.3d 350, 361 (6th Cir. 2008) (quoting *United States v. Copeland*, 51 F.3d 611, 613 (6th Cir. 1995)). Considering the trial record as a whole, including the facts stipulated by the parties, it is clear that the district court exercised sound discretion at each point that a problem arose during jury deliberations. Therefore, the court did not abuse its discretion with respect to Dunnican's motion for a new trial under Rule 33.

---

[9]The district court failed to rule on Dunnican's motion for a new trial pursuant to Federal Rule of Criminal Procedure 33. This failure to rule constituted an implicit denial of the motion. *See United States v. Dubrule*, 822 F.3d 866, 884 (6th Cir. 2016).

Admittedly, the jury deliberations in this case were not straightforward.  Nonetheless, given the events that caused the district court to excuse Juror 12, we find that the court's ultimate decision to excuse Juror 12 for medical reasons was sound.

First, as verified by the record, Juror 12 had reported during *voir dire* that she suffered from Crohn's disease, but would be able to serve as a juror unless she had a "flare-up."  (R. 68 Voir Dire Trans., PageID 59).  Unfortunately, during the first afternoon of deliberations, Juror 12 reported a flare-up, telling the court she had a fever and would have to go to the emergency room, which the court allowed.  (R. 70: Trial Trans., PageID 969–71).

Recognizing that jury deliberations were in progress, and cognizant  that Juror 12 was the only African-American on the panel, the district court then took careful steps before it finally located an alternative juror.  First, the day after Juror 12's exit, the court contacted her directly to inquire of her availability.  During this phone call, Juror 12 requested to be excused; however, trying to find a compromise, the court decided to postpone deliberations for one more day to see if Juror 12's condition would improve following her doctor's visit.  Juror 12's condition did not improve, and she failed to contact the court the next day.  Therefore, after waiting for one-and-half days to see if Juror 12's condition would improve, the court acted appropriately to excuse Juror 12 for medical reasons and replace her with an alternate.[10]

Dunnican did not object to the careful steps the district court took prior to finding a replacement juror; in fact, Dunnican actually conceded both that the court took "reasonable steps under the circumstances" and that the court had no other alternative, but to locate a replacement. (R. 72: Trial Trans., PageID 1003).  And following Dunnican's lack of objection, the district court complied with Federal Rule of Criminal Procedure 24(c)(3) in instructing the jury to begin their deliberations anew.

However, on appeal, Dunnican argues that the rest of the jury was "impacted by issues of race and racial disagreements," and these "racial issues" upset all the other jurors during the deliberation process.  (Appellant's Br., at 53).  The record fails to support this claim.  The district

---

[10]As noted above, Juror 12 did later submit medical records confirming her need to be excused from jury duty.

court interviewed Juror 7 and the Foreperson individually. Although both of these jurors reported that Juror 12 was resisting discussion of the facts of the case, their answers never offered sufficient evidence from which the court could conclude (1) that Juror 12 was refusing to deliberate; or (2) whether any of the jurors who would render the verdict had acted inappropriately during deliberations. There was no evidence that any juror's previous interaction with Juror 12 affected the verdict. Therefore, Dunnican's speculation that there was "documented misconduct" during jury deliberations, is without basis in fact.

Furthermore, as captured in the record, the court instructed the jury to decide the case based solely on the evidence presented—not on any inherent bias or emotion. We act under the assumption that jurors follow the instructions they receive. *United States v. Neuhausser*, 241 F.3d 460, 469 (6th Cir. 2001).

Lastly, Dunnican offers no evidentiary support for his contention that his conviction by an all-white jury violated his Sixth Amendment rights. The Sixth Amendment promises "the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed." U.S. Const. amend. VI. This encompasses defendant's right to have a jury composed of a "fair cross section of the community." *See Taylor v. Louisiana*, 419 U.S. 522, 526–31 (1975). Although petit juries "must be drawn from a source fairly representative of the community," there is "no requirement that [chosen] petit juries . . . must mirror the community and reflect the various distinctive groups in the population." *Id.* at 538. Equally, "[d]efendants are not entitled to a jury of any particular composition, but the jury wheels, pools of names, panels or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative therefor." *Id*.

To demonstrate a *prima facie* unfair jury cross-section claim, Dunnican must show: "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." *Duren v. Missouri*, 439 U.S. 357, 364 (1979). Dunnican neither addressed the elements of an unfair cross-section

claim, nor provided any evidence to show that African Americans were excluded from the jury, that the representation of African Americans was not fair and reasonable, or that African Americans were underrepresented due to any systematic exclusion. In fact, the efforts made by the district court to retain Juror 12, an African American, on the jury, notwithstanding her illness, support the conclusion that there was no exclusion or underrepresentation that would establish a Sixth Amendment violation under the *Duren* factors. Dunnican's mere assertion of a Sixth Amendment violation is not enough to establish that such a violation occurred.

**VII.**

Finally, Dunnican argues that the court's decision to impose an upward variance of 21 month to his sentence was substantively unreasonable.

We review the reasonableness of a sentence under an abuse of discretion standard. *Gall v. United States*, 552 U.S. 38, 51 (2007); *United States v. Jeross*, 521 F.3d 562, 569 (6th Cir. 2008). "Reasonableness review has both substantive and procedural components." *United States v. Donadeo*, 910 F.3d 886, 893 (6th Cir. 2018) (quoting *United States v. Keller*, 498 F.3d 316, 322 (6th Cir. 2007)). "The procedural component requires us to ensure that the district court: '(1) properly calculated the applicable advisory Guidelines range; (2) considered the other 18 U.S.C. § 3553(a) factors as well as [arguments for a sentence outside the range]; and (3) adequately articulated its reasoning for imposing the particular sentence chosen.'" *Id.* (quoting *United States v. Bolds*, 511 F.3d 568, 581 (6th Cir. 2007)).

The substantive component calls for us to review the "substantive reasonableness of the sentence imposed under an abuse of discretion standard[,] . . . taking into account the totality of the circumstances, including the extent of any variance from the Guidelines range." *Gall v. United States,* 552 U.S. 38, 51–53 (2007); *see also Jeross*, 521 F.3d at 569; *United States v. Bolds,* 511 F.3d 568, 581 (6th Cir. 2007). "For sentences within the Guidelines, we may apply a rebuttable presumption of substantive reasonableness. We may not, however, apply a presumption of unreasonableness to outside-Guidelines sentences." *Gall*, 552 U.S. 28. In general, we must give "due deference" to the district court's conclusion that the sentence imposed is warranted by the § 3553(a) factors. *Id.* (citations omitted). "The fact that [we] might

have reasonably concluded that a different sentence was appropriate is insufficient to justify reversal of the district court." *Id.* (quoting *Gall*, 552 U.S. at 51). When evaluating these claims, we focus on whether the length of the sentence is great than necessary to achieve the sentencing goals of 18 U.S.C. § 3553. *United States v. Tristan-Madrigal,* 601 F.3d 629, 632–33 (6th Cir. 2010).

Based on these directives, we conclude that the district court did not abuse its discretion in sentencing Dunnican to 84-months incarceration for his crimes of drug trafficking and being a felon in possession of a firearm, and a consecutive 60-month mandatory sentence under Section 924(c), representing in total, an upward variance of 21 months.

Prior to imposing the sentence, the court considered the nature and circumstances of Dunnican's offense, his personal history and characteristics, and the other proper § 3553 factors. Furthermore, after appropriately characterizing the Guidelines range as the "benchmark" or "starting point" for its sentence calculation, the court outlined the importance of protecting the public and deterring any future retributive acts by Dunnican—both of which are also required factors under § 3553. Finally, the court considered Dunnican's previous criminal history, which included two separate violent crimes that he committed with firearms, involuntary manslaughter, and felonious assault.

Given the district court's assessment of Dunnican's situation, and in light of its responsibility to consider the need to provide just punishment, *see* 18 U.S.C. § 3553(a)(2)(A), Dunnican's argument that the upward variance was "punitive" is misplaced. We have consistently rejected defendants' arguments that a district court cannot impose upward variances based on criminal history, simply because the Guidelines calculation already accounts for criminal history as a factor. *See, e.g. United States v. Herrera-Zuniga*, 571 F.3d 568, 589 (6th Cir. 2009); *United States v. Lanning*, 633 F.3d 469, 478 (6th Cir. 2011); *see also United States v. Trejo*, 729 F. App'x 396, 399 (6th Cir. 2018) ("This Court has consistently held that a district court neither commits procedural error, nor pronounces a substantively unreasonable sentence, simply because, in evaluating the § 3553 factors, it considers, as one component of its decision to vary upward form the Guidelines, conduct that also factored into calculating the Guidelines range.").

In addition, contrary to Dunnican's claim, the district court did consider mitigating factors, and explicitly acknowledged that he had (1) completed his GED; (2) attended college classes; (3) experienced a difficult upbringing during childhood; and (4) currently had children of his own.

Yet, even with these mitigating factors in mind, the district court reasonably found Dunnican's previous criminal history to be the most significant consideration in its sentencing. A district court's "attach[ing] [of] great weight" to a few factors does not constitute reversible error, *see Gall*, 552 U.S. at 57, and inevitably, "[n]ot all § 3553(a) factors are important in every sentencing; often one or two prevail, while others pale." *United States v. Bridgewater*, 479 F.3d 439, 442 (6th Cir. 2007). And, even setting aside Dunnican's previous violent crimes of involuntary manslaughter and felonious assault, the fact remains that only a few months upon being released from a second lengthy prison stay and while still on post-release control, Dunnican was convicted for the current § 922(g), § 841(a)(1) and (b)(1)(D), and § 924(c) offenses—two of which involve a *loaded firearm*. Given these circumstances, the district court reasonably concluded that an above-Guidelines sentence was necessary in order to advance the utilitarian objective of protecting the public and the retributivist objective of deterring Dunnican from criminal conduct in the future.

Considering the above, it is clear that the district court did not abuse its discretion, and Dunnican's sentence is substantively reasonable.

**VIII.**

In addition to the six issues that appointed counsel raised on appeal, Dunnican submitted a pro se supplemental brief, in which he alleged several more errors. These claims relate to (1) alleged jurisdictional defects at the federal and district court level; and (2) constitutional issues related to Dunnican's conviction and confinement. However, a defendant must present a single brief. Fed. R. App. P. 31(a); *United States v. Fontana*, 869 F.3d 464, 472–73 (6th Cir. 2017). Furthermore, when a defendant is represented by counsel and files a supplemental brief pro se, we may properly decline to consider those pro se claims. *United States v. Williams*, 641 F.3d 758, 770 (6th Cir. 2011). And here, "because [Dunnican] was represented by counsel

on this appeal, we decline to address [his] pro se arguments." *Id.*; *cf. United States v. Martinez*, 588 F.3d 301, 328 (6th Cir. 2009) (declining to address a defendant's pro se arguments because he was represented by counsel).

**IX.**

To summarize, we hold the following: (1) the district court did not err in allowing the government under Federal Rule of Evidence 902(14) to introduce data extracted from Dunnican's cellular telephone; (2) the district court properly exercised its discretion in allowing the government under Federal Rule of Evidence 404(b)to introduce text messages from Dunnican's cellular telephone; (3) the district court properly exercised its discretion in allowing a DEA agent to offer opinion testimony that the marijuana found in Dunnican's car appeared to be packaged for distribution; (4) the district court properly exercised its discretion in denying Dunnican's motion for a judgment of acquittal following the government's presentation of evidence; (5) the district court properly exercised its discretion when denying Dunnican's motion for a new trial following the dismissal of a jury member; and (6) the district court properly exercised its discretion in imposing a 21-month upward variance on Dunnican's sentence.

Therefore, we **AFFIRM** the district court's judgment in full.