RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0176p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

>*Plaintiff-Appellee*,

*v.*

BAHA JAFFAL,

>*Defendant-Appellant*.

No. 22-3552

---

Appeal from the United States District Court for the Northern District of Ohio at Cleveland.
No. 1:20-cr-00155-1—Benita Y. Pearson, District Judge.

Argued: June 16, 2023

Decided and Filed: August 14, 2023

Before: GILMAN, BUSH, and READLER, Circuit Judges.

---

## COUNSEL

**ARGUED:** Ciara N. Barone, Riley K. Segars, UNIVERSITY OF VIRGINIA SCHOOL OF LAW, Charlottesville, Virginia, for Appellant. Matthew B. Kall, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee. **ON BRIEF:** Ciara N. Barone, Riley K. Segars, J. Scott Ballenger, UNIVERSITY OF VIRGINIA SCHOOL OF LAW, Charlottesville, Virginia, for Appellant. Matthew B. Kall, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee.

---

## OPINION

---

RONALD LEE GILMAN, Circuit Judge. Baha Jaffal was indicted by a federal grand jury on two counts of possessing controlled substances with the intent to distribute the drugs, in violation of 21 U.S.C. § 841(a)(1). Count 1 involved the distribution of 35.69 grams of a

mixture containing heroin and carfentanil that was found in Jaffal's coat pocket on November 11, 2019. Count 2 involved 27 pills containing fentanyl and 4-ANPP (a schedule II controlled substance) that were found in Jaffal's pocket on December 12, 2019. The grand jury also indicted Jaffal for using or carrying a firearm in relation to a drug-trafficking crime (Count 3), in violation of 18 U.S.C. § 924(c), and for being a felon in possession of a firearm (Count 4), in violation of 18 U.S.C. § 922(g)(1). We refer to the counts as they were numbered at trial, not as they were numbered in the indictment (which included an additional count that was later dismissed). A jury convicted Jaffal on all four counts.

On appeal, Jaffal argues that his convictions for Counts 1, 2, and 3 should be overturned because the district court erroneously admitted (1) "other acts" evidence, in violation of Rule 404(b) of the Federal Rules of Evidence (Fed. R. Evid.); (2) hearsay evidence; and (3) expert opinion testimony about Jaffal's mental state. Jaffal also argues that these three convictions should be overturned because he was entitled to a lesser-included-offense instruction for simple possession of the drugs. He does not appeal his conviction on Count 4.

For the reasons set forth below, we **AFFIRM** all of the district court's evidentiary rulings, **REVERSE** its failure to give the lesser-included-offense instruction, and **REMAND** for a new trial on Counts 1, 2, and 3.

## I. FACTUAL BACKGROUND

### A. Jaffal was arrested following a drug overdose

Count 1 involves events that took place on the evening of November 11, 2019 when Parma Police Officers Bryan Bernow and Nathan Ciarrone responded to a 911 call that a man was overdosing on drugs. When the officers and paramedics arrived on the scene, they discovered Jaffal on the floor, unresponsive and struggling to breathe. The officers administered Narcan to counteract the effects of the opioids, and they were eventually able to revive him. Jaffal's girlfriend, Raya Al-Assadi, was also present and had already administered Narcan to Jaffal before the officers arrived.

While still on the premises, Officer Ciarrone found a single pill, which he suspected to be a narcotic, in a plastic bag between Jaffal's legs. Although the pill appeared to be a 0.03-gram oxycodone tablet, subsequent testing revealed that it was actually a 0.10-gram mixture of fentanyl and 4-ANPP. Officer Ciarrone also found a folded-up five-dollar bill containing a powdery substance in Jaffal's pocket. Subsequent testing revealed that the five-dollar bill contained 0.37 grams of a heroin and carfentanil mixture. In another pocket, the officers found approximately $2,700 in cash.

As he was being prepared for transport to the Parma Hospital for additional medical treatment, Jaffal said that he was cold and asked for his jacket. Al-Assadi grabbed a jacket, which an officer took from her to check for weapons. The officer found a sandwich bag containing suspected narcotics in the jacket pocket. Subsequent testing revealed that the bag contained 35.69 grams of a mixture containing heroin and carfentanil.

After Jaffal was transported to the hospital, the officers asked Al-Assadi for consent to search her home with a drug dog. Al-Assadi gave her consent. The officers discovered a number of THC vape pens (which were not seized) and a pill bottle with a white powdery substance in it. No other significant evidence was found, including no evidence of any scales, packaging materials, cutting agents, mixing utensils, or any other tools that might commonly be associated with narcotics distribution.

**B. Jaffal's phone conversations were recorded while he was in jail**

After Jaffal was discharged from the hospital, he was arrested and taken to jail. Several phone calls between Jaffal and Al-Assadi were recorded while Jaffal was in police custody. Portions of these recorded calls were authenticated by and introduced at trial through Detective Norman Kekic, who was assigned to investigate Jaffal's case. Detective Kekic also offered expert opinion testimony at trial to aid the jurors in understanding the evidence.

On the first phone call introduced at trial, Jaffal asked Al-Assadi what the police found on him while he was overdosing. She replied that "[t]hey found that fucking shit, bro, because you called for your fucking coat," prompting Jaffal to say: "I'm gonna go to prison." The conversation continued with Al-Assadi telling Jaffal that the police had found "[t]he big bag" in

his coat pocket and took his phone. Jaffal repeatedly said that he was "never getting out no time soon," and that he was "gonna be gone for a long time."

In another excerpt of the call, Al-Assadi said that all the police found was "that big baggy and that little personal." Jaffal then said that "they could tell I'm a user," to which Al-Assadi replied "it was all personal." Al-Assadi continued and said that Jaffal "just like[d] to buy a big amount at one time and use it for personal," to which Jaffal said "[y]eah. I mean, I overdosed."

Detective Kekic testified that the term "little personal" meant drugs intended for personal use, in contrast to a "big baggy" of drugs (later tested and confirmed to weigh 35.69 grams), which Detective Kekic did not believe could have been intended for only personal use. Based on his experience, Detective Kekic testified that most narcotics users carry only "about a half a gram to a gram" at a time and that they "usually don't have enough money" to purchase large quantities for personal use, such as a month's supply. The 35.69 grams of narcotics found in Jaffal's coat pocket were estimated by Detective Kekic to have a street value of approximately $4,200. Detective Kekic did not specifically investigate Jaffal's sources of income, and he acknowledged that Jaffal might have been paid in cash at his job as a convenience-store clerk.

For heavy narcotics users, Detective Kekic testified that they could use as much as 1.5 grams of heroin per day, which meant that the 35.69 grams found in Jaffal's coat pocket could be approximately a 23-day supply for a heavy heroin user. Detective Kekic nonetheless believed, based on finding over 35 grams of narcotics on Jaffal, that he was investigating "a drug trafficking situation."

Other phone conversations introduced at trial evidenced an attempt by Al-Assadi to hide certain evidence. Al-Assadi, for example, spoke about trying to hide Jaffal's phone, but that the police found it anyway. She also mentioned that she "made sure that [the police] didn't see shit." Detective Kekic testified at trial that he believed that other evidence was not found at the scene because Al-Assadi had cleansed the premises.

Al-Assadi also spoke about her financial concerns since Jaffal was in jail, telling Jaffal that "the bills are so expensive" and that she might need to have her sister move in with her. Jaffal tried to assuage Al-Assadi's concerns and told her: "You'll be fine. Just follow my lead

and relax. . . . You don't need to do none of that."  He also instructed Al-Assadi to take his clothes to someone named Pete and that Pete would help out, but Al-Assadi was not so confident, telling Jaffal that Pete had told her that Jaffal owed him money.  Jaffal insisted, however, that it was "the complete opposite" and that he did not owe any money to Pete. Instead, Jaffal claimed that someone named Hillary owed him $500 "for the other shit" and $1,200 for a car.  Al-Assadi also told Jaffal that she intended to "collect from" someone named Deangelo.

Based on these calls, Detective Kekic testified at trial that there appeared to be financial issues going on.  He also testified that some people addicted to drugs turn to drug dealing to "feed their habit."

While Jaffal was in custody, Detective Kekic sought Jaffal's cooperation by asking him to provide information about his supplier.  Jaffal soon posted bond and was released from jail, however, causing Detective Kekic to lose contact with Jaffal.

## C.  Jaffal was arrested a second time

About one month later, on December 12, 2019, Jaffal was arrested again when his car was pulled over by Officer Michael Strange.  The events from this arrest were the bases of Counts 2, 3, and 4.  Officer Strange attempted to pull Jaffal over because he received a tip that the car was being driven erratically.  Jaffal did not pull over until, after making several turns, he reached a dead end.  Shortly before Jaffal stopped, Officer Strange saw "a pill bottle fly out of the driver's side window."

Officer Strange and other officers on the scene arrested Jaffal and searched him and his car.  The officers found $1,097 in cash and a bag containing 27 pills in Jaffal's pockets. Although the pills appeared to have the markings of a 30-milligram oxycodone tablet, they were later tested and confirmed to contain a total of 2.90 grams of a mixture of fentanyl and 4-ANPP (similar to the single pill found between Jaffal's legs on the day that he overdosed).  The officers also recovered a magazine containing 10 rounds of .40-caliber ammunition in the car's console.

Two other pieces of evidence were recovered from the side of the road.  The first was the pill bottle that Officer Strange saw thrown from Jaffal's car window, which was labeled as Alprazolam (the generic form of Xanax).  Later testing confirmed that the bottle contained Alprazolam tablets, which is a controlled substance.  Jaffal, however, was never charged with an offense associated with these pills.

The second item recovered was a .40-caliber, loaded handgun that was discovered by an officer retracing the path of the pursuit.  Testimony at trial confirmed that the ammunition in the gun matched that found in the console of the car that Jaffal was driving.  The handgun was owned by and the car was rented to an acquaintance of Jaffal's named Jeremiah Brown.  Jaffal ultimately called Brown as his sole witness at trial, eliciting testimony that Brown had loaned the car to Jaffal and had accidentally left the gun in the center console.

**D.  Additional phone conversations were recorded while Jaffal was in jail following his second arrest**

Jaffal made several additional calls that were recorded following his December 12, 2019 arrest.  The first introduced at trial was between Jaffal, Al-Assadi, and someone named Jake. When discussing his overdose, Jaffal said that he received pills from Detroit that were laced with fentanyl.  He was apparently told by the supplier that he should not take a full one, and to only take half of one at first, but that his "dumb-ass took a whole one" anyway.

Jaffal also told Jake to "handle Detroit" with Al-Assadi.  Al-Assadi agreed that she wanted to "do business with them" in Detroit, to which Jaffal said: "[Y]ou can do business a couple times too."  Detective Kekic testified that Detroit was one of many "pipelines" for fentanyl in Cleveland, but also acknowledged that vape and marijuana products also come down from Detroit.

Al-Assadi brought up her financial distress again in another call.  But Jaffal assured her that she had "like 20, 30 grand still left in the street."  Jaffal then more specifically explained that Al-Assadi had "two cars worth $20,000," "10 grand worth of [unintelligible] on the street," and "$5,000 worth, $6,000 worth of product at the house."  Detective Kekic explained that the term "product" in this context means "any type of narcotics."

In another call, Jaffal tried to convince Al-Assadi that she should tell the police that the gun found in the car was hers, but that the drugs were his. Jaffal was worried that the presence of the gun would make it look like he was "selling instead of just using." Al-Assadi simply responded: "Okay." At trial, Detective Kekic testified that the presence of a gun is more indicative of drug trafficking than simple possession because dealers want weapons for protection, whereas drug users often cannot afford them.

## II. PROCEDURAL BACKGROUND

### A. Evidentiary rulings on the recorded phone conversations

Jaffal objected, both before and during trial, to the introduction of certain portions of the recorded phone calls. First, Jaffal argued that certain statements in the jail recordings that reference "pills laced with fentanyl, vape pens, and having Ms. Al-Assadi conduct business for him in the City of Detroit" were inadmissible under Fed. R. Evid. 404(b) because they were "only probative of Mr. Jaffal's intent by way of showing a propensity to engage in drug trafficking." The court overruled Jaffal's objections to the evidence, finding that the recordings were admissible to show Jaffal's intent to distribute narcotics and that the probative value was not substantially outweighed by unfair prejudice. It did, however, order the government to redact any mention in the recordings of "pens" or "vape pens" because Jaffal was not charged with an offense related to the vape pens, and that their inclusion would be unfairly prejudicial.

Second, Jaffal argued that certain statements made by Al-Assadi on the recordings should be excluded because they were inadmissible hearsay. The district court overruled Jaffal's objections, finding that the statements by Al-Assadi were admissible to provide context to Jaffal's own statements, which were themselves admissible as party admissions under Fed. R. Evid. 801(d). When the government introduced the calls at trial, the court instructed the jury that Al-Assadi's statements on the recording were "to be regarded only to place in context what Mr. Jaffal says, not for her words' truthfulness, just for context." The court repeated a similar instruction during the closing jury instructions.

**B.  The district court allowed Detective Kekic to provide expert testimony**

The government elicited expert testimony from Detective Kekic.  Jaffal objected to the expert testimony, causing the district court to hold a *Daubert* hearing to determine whether Detective Kekic was qualified to testify as an expert witness.  It ultimately concluded that Detective Kekic had the requisite "knowledge, skill, experience, and training sufficient enough to assist the trier of fact" at trial.  The court also provided a limiting instruction at trial, pointing out to the jury Detective Kekic's dual role as both a fact witness (testifying based on personal knowledge) and as an expert witness (providing opinion testimony based on his experience).

**C.  The district court denied Jaffal's request for a lesser-included-offense instruction**

Jaffal requested both before and during trial that the jury be given a lesser-included-offense instruction regarding the simple possession of drugs.  The district court declined to make a pretrial ruling on this issue.  At the close of all of the evidence, the court denied Jaffal's request, finding no rational basis for the jury to conclude that Jaffal simply possessed the narcotics in question.  The court also concluded that the evidence presented was "sufficient to show that Mr. Jaffal possessed with intent to distribute as charged" in both Counts 1 and 2.

In reaching its conclusion, the court noted that the large quantity of drugs at issue was "overwhelming evidence," along with the fact that Jaffal's own statements in the recorded jail calls (even when ignoring the statements made by Al-Assadi and Jake) supported the conclusion that Jaffal was trafficking narcotics.  Moreover, the evidence showed that Jaffal was found in possession of a large amount of cash and a gun.  All of this led the court to conclude that there was "no justifiable basis for instructing the jury on a lesser included offense."

**D.  Jaffal was convicted on all counts**

The jury found Jaffal guilty on all four counts.  Jaffal filed a post-trial motion for acquittal and a motion for a new trial.  He argued that the district court made several evidentiary errors and that the court should have provided the lesser-included-offense instruction.  The court denied both motions, finding that it had made no evidentiary errors warranting a new trial and that Jaffal was not entitled to an instruction regarding a lesser included offense.  In reaching its

conclusion on the lesser-included-offense instruction, the court noted that the government presented "sufficient evidence" of intent to distribute, that the jury would have had to "entirely disregard [Jaffal's] own words" to find that he did not intend to distribute, and that "the evidence, as a whole, would not have allowed a rational jury to convict [Jaffal] of mere possession." Jaffal was ultimately sentenced to 152 months of imprisonment.

## III. ANALYSIS

### A. The district court did not err in admitting certain phone recordings used to show Jaffal's intent

Jaffal objected to the admission of certain phone recordings both before and during trial, arguing that they were inadmissible under Fed. R. Evid. 404(b). More specifically, Jaffal challenges certain statements in the recordings from Trial Exhibit 21a that reference "pills . . . laced with fentanyl" that came from Detroit and "business" that Al-Assadi and Jake needed to "handle [in] Detroit" because, according to Jaffal, they were impermissibly used to show that Jaffal had a propensity to commit the crimes charged. The government responds by arguing that the statements in contention were permissibly used to show Jaffal's intent to distribute narcotics. We agree with the government and conclude that the district court did not err in admitting these statements.

Fed. R. Evid. 404(b)(1) provides that "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." But such evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). District courts employ a three-step process to determine the admissibility of "other acts" evidence under Fed. R. Evid. 404(b):

> First, the district court must make a preliminary determination regarding whether there is sufficient evidence that the "other acts" took place. The district court must then determine whether those "other acts" are admissible for a proper purpose under Rule 404(b). Finally, the district court must determine whether the "other acts" evidence is more prejudicial than probative.

*United States v. Bell*, 516 F.3d 432, 440 (6th Cir. 2008) (quoting *United States v. Lattner*, 385 F.3d 947, 955 (6th Cir. 2004)).

We typically review a district court's evidentiary rulings under the abuse-of-discretion standard. *United States v. Clay*, 667 F.3d 689, 693 (6th Cir. 2012). For Rule 404(b) evidence, however, we review each prong of the analysis under a different standard: (1) we use the clear-error standard in reviewing the factual determination of whether the other acts actually took place, (2) we review de novo the legal determination of whether the other acts were admissible for a proper purpose, and (3) we use the abuse-of-discretion standard in reviewing the determination of whether the other-acts evidence is more prejudicial than probative. *Id.*; *accord United States v. Mandoka*, 869 F.3d 448, 456-57 (6th Cir. 2017) (acknowledging an alleged "intra-circuit split" regarding the standard of review for Rule 404(b) evidence, but concluding that "the abuse of discretion and tripartite standards of review 'are not in fact inconsistent, because it is an abuse of discretion to make errors of law or clear errors of factual determination'" (quoting *Bell*, 516 F.3d at 440)).

The government argues that we should review this claim under the plain-error standard because Jaffal's argument on appeal is allegedly different from the one he made below. We disagree because Jaffal clearly objected to the "other acts" evidence contained within the recorded phone call in question on the basis that it was not probative of intent, even after the court redacted all references to vape pens. We therefore analyze the three prongs under this court's tripartite standard of review.

### 1. The district court did not clearly err in determining that the phone calls took place

The district court determined that the recorded phone calls took place, and Jaffal does not dispute that determination. Jaffal instead argues that the court erred because it should have determined whether the underlying *content* that was referenced in the recordings took place, not just whether the phone calls took place. According to Jaffal, the phone calls were "not the prior act that might need to be excluded; the 'business' was."

We disagree. The government was not using the evidence to demonstrate that Al-Assadi and Jake subsequently engaged in the "business" that Jaffal mentions on the phone, just that Jaffal told them to do so. In other words, Jaffal's statements themselves are what the government argued shed light on Jaffal's intent. The district court therefore did not err in concluding that the "other acts" took place. *See United States v. Barnes*, 822 F.3d 914, 917-18, 921 (6th Cir. 2016) (concluding that the district court did not err in allowing the introduction of a recorded jail call discussing pill distribution for the purpose of showing Barnes's intent to distribute drugs because there was "sufficient evidence that Barnes placed the recorded calls and made the statements captured on the recordings").

### 2. The district court did not err in concluding that the evidence was submitted for a proper purpose

To determine whether evidence is admissible for a proper purpose, the district court must decide if "that evidence is probative of a material issue other than character." *Bell*, 516 F.3d at 441 (quoting *United States v. Carney*, 387 F.3d 436, 451 (6th Cir. 2004)). This requires analyzing whether (1) "the evidence is offered for an admissible purpose"; (2) the purpose is material, or "in issue"; and (3) "the evidence is probative with regard to the purpose for which it is offered." *Id.* at 441-42 (quoting *United States v. Rayborn*, 495 F.3d 328, 342 (6th Cir. 2007)). Question (1) is not in dispute because Fed. R. of Evid. 404(b)(2) explicitly notes that demonstrating a defendant's intent is a permissible purpose. *See id.* at 442. Nor is question (2) in dispute because the government had to prove Jaffal's intent in order to establish possession with the intent to distribute drugs. *See* 21 U.S.C. § 841(a)(1); s*ee also United States v. Lattner*, 385 F.3d 947, 957 (6th Cir. 2004) (citing *United States v. Johnson*, 27 F.3d 1186, 1192-93 (6th Cir. 1994) ("This Court has held that when a defendant is charged with a specific intent crime, such as possession with intent to distribute, 404(b) evidence is admissible to prove intent, subject to the probative/prejudicial balancing.").

That leaves question (3), which is admittedly a closer question. "To determine if evidence of other acts is probative of intent, we look to whether the evidence relates to conduct that is 'substantially similar and reasonably near in time' to the specific intent offense at issue." *Bell*, 516 F.3d at 443 (quoting *United States v. Haywood*, 280 F.3d 715, 721 (6th Cir. 2002))

(internal quotation marks omitted). Although we have "repeatedly recognized that prior drug distribution evidence is admissible to show intent to distribute," such evidence is "probative of present intent to possess and distribute" only when "the prior distributions were part of the same scheme or involved a similar *modus operandi* as the present offense." *Id.* (quoting *United States v. Ayoub*, 498 F.3d 532, 548 (6th Cir. 2007)). And prior acts of *personal* drug use are not probative of intent to *distribute* drugs. *Id.* at 443-44.

In one of the recordings, Jaffal instructed Jake to "handle Detroit," and also told Al-Assadi that she could "do business a couple times too." These statements are reasonably interpreted as an instruction to distribute drugs of some kind. Jaffal also discussed two different controlled substances, the first being fentanyl-laced pills similar to those at issue in Count 2, and the second being THC vape pens.

For the fentanyl-laced pills, Jaffal said on the recording that they came from Detroit, and that they were the same type of pills on which he had overdosed on November 11, 2019. And when he overdosed, the police found a pill between Jaffal's legs that, although it appeared to be a 30-milligram oxycodone tablet, was tested and confirmed to contain fentanyl and 4-ANPP. This pill exactly matched the description and the lab testing of the 27 pills that were found on Jaffal when he was arrested on December 12, 2019, which also appeared to be 30-milligram oxycodone tablets, but actually contained fentanyl and 4-ANPP. The evidence therefore supports the government's argument that, when Jaffal mentioned on the phone call that he had overdosed on a pill "laced with fentanyl" that came from Detroit, he was discussing the same or substantially similar narcotics as those that he was charged with distributing in Count 2.

The discussion of THC vape pens is in a portion of the recording that was redacted and not heard by the jury. In the redacted portion, Jaffal explicitly told Jake to "put some pens in [Al-Assadi's] hands . . . and she'll take over everything for me. She knows what to do." When looking at the statement in its entirety, Jaffal's reference to "business" in Detroit could presumably mean distributing either the fentanyl-laced pills or the THC vape pens.

If Jaffal meant the former, then the evidence was clearly relevant to the same drug-distribution scheme as that at issue in Count 2. The fentanyl-laced pills being discussed

were the same as the 27 pills found on Jaffal when he was arrested on December 12, 2019, and Jaffal's instructions, made only six weeks after his arrest, indicate a clear intent to distribute some type of narcotics. *See United States v. Barnes*, 822 F.3d 914, 921-22 (6th Cir. 2016) (allowing the introduction of a recorded jail call in which Barnes "instruct[ed] others to distribute controlled substances on his behalf" because the calls were placed during the detention arising from the initial arrest and "part of the same scheme of drug distribution" as the charged crime) (citation omitted).

But if Jaffal instead meant the "business" in Detroit to be only about the distribution of THC vape pens, then the analysis is more complicated. Jaffal argues that, because he was never charged with the distribution of THC vape pens, the evidence of Jaffal instructing Al-Assadi and Jake to do "business" in Detroit could permit "the very kind of reasoning—*i.e.*, once a drug dealer, always a drug dealer—which 404(b) excludes." *See Bell*, 516 F.3d at 444. But the district court redacted all references to "vape pens" in the relevant phone call to avoid this very problem. Without any references to the THC vape pens, the jury could not have inferred that an intent to distribute vape pens constituted an intent to distribute the narcotics at issue in Count 2.

Jaffal also argues that the ambiguity in the term "business" means that the recording is not necessarily about the same drug-distribution scheme as that at issue in Count 2. True enough, the distribution of fentanyl-laced pills is not the same as the distribution of THC vape pens. But this court has made clear that "the prior act need not 'be identical in every detail' to the charged offense." *United States v. Cordero*, 973 F.3d 603, 623 (6th Cir. 2020) (quoting *United States v. Alkufi*, 636 F. App'x 323, 332 (6th Cir. 2016)). For example, in *Cordero*, this court affirmed the admission of other-acts evidence involving Cordero's distribution of synthetic marijuana (K2) because it was "sufficiently related and close in time" to Cordero's alleged distribution of cocaine. *Id.* at 621-23. The court noted that the K2-distribution scheme occurred at the same time as the cocaine-distribution scheme, involved the same coconspirators, and involved a similar modus operandi. *Id.* at 623.

Even taking Jaffal's contention that the "business" in Detroit related only to the THC vape pens, that distribution was occurring at the same time as the alleged distribution of the fentanyl-laced pills, which was just six weeks after Jaffal was arrested with 27 fentanyl-laced

pills.  Jaffal also explicitly discussed the fentanyl-laced pills with both Al-Assadi and Jake on the very same phone call where he discussed the vape pens, indicating not only that the alleged distribution schemes were occurring reasonably close in time, but also that the same players were relevant to both potential distribution schemes.  Such evidence is therefore reasonably understood as conduct relating to the same drug-distribution scheme as that alleged in Count 2. *See id.*; *see also United States v. Ismail*, 756 F.2d 1253, 1259 (6th Cir. 1985) (upholding the admission of prior-acts evidence involving the distribution of hashish (a marijuana product) and cocaine even though the charged offense involved heroin).

At bottom, the district court did not err in admitting the phone call in question. Importantly, the court took caution to address Jaffal's concerns by redacting the portions of the recording that might foster the impermissible "once a drug dealer, always a drug dealer" reasoning, thereby avoiding the main concern of Fed. R. Evid. 404(b).  We acknowledge that such redaction might have introduced prejudice of a different kind (namely, that without any mention of the vape pens in the recording, the jury might have been left to conclude that the "business" in Detroit was only about the fentanyl-laced pills), and that the full, unredacted recording would have allowed the jury to conclude that the "business" was not about the fentanyl-laced pills at all.  For those reasons, this is a close question.  But on balance, the evidence was probative of Jaffal's intent to distribute the drugs at issue, making the evidence admissible for a proper purpose.

### 3. The district court did not err in balancing the probative value versus the prejudicial effect of the recording

The district court also concluded that the probative value of the recording was not substantially outweighed by its prejudicial effect, especially with all references to vape pens removed.  We review this decision under the abuse-of-discretion standard, affirming the court's decision "unless we are left with the definite and firm conviction that the district court committed a clear error in judgment." *Bell*, 516 F.3d at 440 (quoting *United States v. Dixon*, 413 F.3d 540, 544 (6th Cir. 2005)).  The balancing test is "strongly weighted toward admission," and district courts "enjoy 'broad discretion' in making the prejudice determination." *United States v. Asher*, 910 F.3d 854, 860 (6th Cir. 2018) (quoting *United States v. Carney*, 387 F.3d

436, 451 (6th Cir. 2004)).  We must view the admitted evidence "in the light most favorable to its proponent, maximizing its probative value, and minimizing its prejudicial effect."  *Id.* (quoting *Carney*, 387 F.3d at 451).

As noted above, the evidence is probative of Jaffal's intent to distribute drugs because, only six weeks after his arrest for the possession of the 27 fentanyl-laced pills, he was recorded discussing those same type of pills.  He was also heard instructing Al-Assadi and Jake to distribute drugs of some kind.  When viewed in the light most favorable to the government, this evidence entails conduct that is substantially similar and reasonably near in time to the distribution scheme alleged in Count 2, and the evidence supports the likelihood that Jaffal had the requisite intent to distribute the narcotics in the charged offense.  *See id.* ("[P]robative value depends mainly on two factors: similarity and temporal proximity.").

The district court also mitigated the greatest risk of prejudice by redacting any mention of the THC vape pens, thereby eliminating any reference to an uncharged controlled substance.  But the court was somewhat caught between a rock and a hard place because the elimination of any mention of the vape pens introduced the risk that the jury, without realizing that vape pens were mentioned in the recorded conversation, would conclude that the "business" in Detroit was necessarily about the fentanyl-laced pills.

This potential prejudice, however, does not substantially outweigh the probative value of the evidence, particularly because Jaffal himself invited the potential prejudice by singling out, in his original motion for exclusion of the jail recordings, the "references to [Jaffal's] use or sale of marijuana or marijuana vaping paraphernalia" as being themselves unfairly prejudicial.  The district court, in redacting references to vape pens, therefore resolved Jaffal's chief complaint about the evidence.  We therefore hold that the district court did not abuse its discretion in carefully trying to deal with Jaffal's objections to the evidence, even if some potential prejudice remained.

**B.  The district court properly admitted recorded statements made by Al-Assadi because they gave context to Jaffal's own words**

Jaffal next raises his hearsay objections.  He objected, both before and during the trial, to the admission of certain statements made by Al-Assadi on the recorded phone calls.  The district court denied Jaffal's motion, concluding that Al-Assadi's statements on the phone calls were not hearsay because they were admitted only to give context to Jaffal's own statements.  When the government ultimately introduced these statements at trial, the court instructed the jury that Al-Assadi's statements were "to be regarded only to place in context what Mr. Jaffal says, not for her words' truthfulness."  A similar instruction was given during the closing jury instructions.

The parties agree that Jaffal's own recorded statements were admissible as party-admissions under Fed. R. Evid. 801(d)(2)(A), but dispute whether the admission of Al-Assadi's statements on the same recordings were inadmissible hearsay.  Although we review a district court's evidentiary rulings under the abuse-of-discretion standard, the issue of "whether a statement is hearsay is a legal question that we review de novo."  *United States v. Porter*, 886 F.3d 562, 566 (6th Cir. 2018).

Jaffal takes issue with both the admission of Al-Assadi's statements and the government's use of those statements during its opening statement and closing argument.  We address both issues in turn below.

### 1.  The statements by Al-Assadi were properly admitted

Hearsay is defined in Fed. R. Evid. 801(c) as a statement that "(1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."  A statement is not hearsay if it "is offered against an opposing party and . . . was made by the party in an individual or representative capacity."  Fed. R. Evid. 801(d)(2)(A).  For this reason, Jaffal's own statements on the recordings are not hearsay.

This court has also routinely admitted statements made by a second participant in a conversation when they are used to place the declarant's own statements into context.  *See, e.g.*, *United States v. Dunnican*, 961 F.3d 859, 872-73 (6th Cir. 2020); *United States v. Henderson*,

626 F.3d 326, 337 (6th Cir. 2010); *United States v. Jacob*, 377 F.3d 573, 581 (6th Cir. 2004). The admission of Al-Assadi's statements, which were used to provide context to Jaffal's own statements, was therefore proper.

Jaffal nevertheless challenges the admission of certain statements by Al-Assadi that reference (1) hiding evidence, (2) financial struggles, and (3) what the police found on Jaffal when he overdosed. We disagree with Jaffal's argument, concluding instead that these statements were properly admitted to provide context to Jaffal's own statements.

### a. Statements about hiding evidence

Three recordings contain statements from Al-Assadi about hiding evidence. In the first, Al-Assadi told Jaffal that she "hid [his] . . . phone," but that the officers "found [it]." Jaffal replied that he was "never getting out no time soon." This reply by Jaffal is understood only when placed in the context of what Al-Assadi said; i.e., that, although she tried to hide his phone, the officers still found it. Jaffal's words would otherwise make no sense.

In the second recording, Jaffal told Al-Assadi that she was "supposed to put me in a vehicle and take me to the ER and make sure nothing was in my pocket." Al-Assadi's direct response to Jaffal adds context to his instructions: "I made sure that they didn't see shit." She thus provided details about what Jaffal meant by "mak[ing] sure nothing was in my pocket."

And finally, in the third recording, Jaffal asked Al-Assadi: "[w]here's my phone at?" Al-Assadi, responding directly to Jaffal's question, said: "They took it. I went and hid your phone." Her words therefore provide context to the properly admitted evidence because they are the direct answer to Jaffal's question.

The district court's inclusion of these statements was proper. Detective Kekic's expert testimony about these phone calls was similarly proper. First, a lot of Detective Kekic's testimony was not about Al-Assadi's statements at all, but just about the typical behavior that he sees in a drug investigation. Second, even if Al-Assadi's statements were inadmissible hearsay, Fed. R. Evid. 703 "allows a testifying expert to rely on materials, including inadmissible hearsay, in forming the basis of his opinion." *Engebretsen v. Fairchild Aircraft Corp.*, 21 F.3d 721, 728

(6th Cir. 1994); *see also United States v. Scott*, 716 F. App'x 477, 485 (6th Cir. 2017) ("Rule 703 allows an expert witness to testify to an opinion that is supported by inadmissible hearsay evidence.").

### b. Statements about financial struggles

Two recordings contain statements by Al-Assadi about her financial struggles after Jaffal was arrested.  In the first, Al-Assadi said multiple times that "bills are so expensive" and that she "can't afford" certain bills.  Jaffal directly responded to her struggles, stating: "You'll be fine. Just follow my lead and relax.  You'll be fine, bro."  Al-Assadi's statements are needed to understand Jaffal's own instructions about how she should address any financial insecurity.

And in the second recording, Al-Assadi and Jaffal again discussed financial concerns about who owed Jaffal money.  In fact, it is Jaffal's statements that indicate the financial concerns, not Al-Assadi's.  As noted above, Jaffal's own words were admissible as party-admissions.

Detective Kekic's expert testimony about Al-Assadi's financial concerns was likewise proper, just as it was for her statement about hiding evidence.  His testimony about "picking up on" financial issues from the phone calls was related to Jaffal's statements alone about who owed Jaffal money.  And Detective Kekic's general testimony about how addicts often turn to dealing to "feed their habit" and to "pay[] bills" was not about Al-Assadi's statements at all, but about what Detective Kekic has learned over the years about drug trafficking in general.  There was thus no error in the admission of this evidence.

### c. Statements about what the police found on Jaffal when he overdosed

The final recording that Jaffal questions is Al-Assadi's statement to Jaffal that "[a]ll they found on you was that big baggy and that little personal."  In response, Jaffal said: "I mean, they could tell I'm a user, but [unintelligible]."  Al-Assadi again said that Jaffal "just like[s] to buy a big amount at one time and use it for personal," to which Jaffal replied: "Yeah.  I mean, I overdosed, but still that [unintelligible]."  Jaffal's statements about overdosing and being a user make sense only because Al-Assadi is discussing what the police found on him when he

overdosed. He was precisely responding to what Al-Assadi was telling him about what the officers found, indicating that her statements are clearly necessary to give his own words context. This was properly allowed.

Finally, Detective Kekic's testimony about what "personal" means in drug-trafficking cases was not an impermissible use of Al-Assadi's statements. It was instead a general observation about his own experience, which did not render Detective Kekic's testimony improper.

### 2. *The government did not improperly use the statements by Al-Assadi during its opening statement and closing argument*

Having determined that Al-Assadi's statements in the recordings were all properly admitted, we now turn to Jaffal's argument that the government nonetheless used Al-Assadi's statements during its opening statement and closing argument improperly—i.e., to prove the truth of what she asserted. "This Court employs a two-part test to determine whether prosecutorial misconduct warrants a new trial. 'Under this approach, a court must first consider whether the prosecutor's conduct and remarks were improper,' and 'then consider and weigh four factors in determining whether the impropriety was flagrant and thus warrants reversal.'" *Girts v. Yanai*, 501 F.3d 743, 758-59 (6th Cir. 2007) (internal citations omitted) (quoting *United States v. Carter*, 236 F.3d 777, 783 (6th Cir. 2001)). The four flagrancy factors are:

> (1) whether the conduct and remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the conduct or remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) whether the evidence against the defendant was strong.

*Id.* at 759 (quoting *Carter*, 236 F.3d at 783).

We conclude that Jaffal's argument fails at part one of the inquiry because all of the government's statements were proper. As discussed above, Al-Assadi's statements were not hearsay because they were introduced solely to provide context to Jaffal's own statements. The government was therefore free to similarly use these statements during its opening statement and closing argument. Further, the district court twice provided a strong limiting instruction, telling the jury that it could not consider Al-Assadi's statements for their truth, but just to provide

context. *See Scott v. Mitchell*, 209 F.3d 854, 879 (6th Cir. 2000) (noting that we must presume that curative instructions were effective "unless there is an 'overwhelming probability' that they were ignored" (quoting *Richardson v. Marsh*, 481 U.S. 200, 208 (1987))).

### a. *Statements about hiding evidence*

Jaffal argues that the government crossed the line during its opening statement and closing argument when it commented on Al-Assadi's statements about hiding evidence. In its opening statement, the government simply mentioned that the jury would hear that Al-Assadi tried to "hide things in the house, and tr[ied] to hide [Jaffal's] phone, showing that there were things that they were trying to get rid of." Mentioning evidence that the jury will hear is proper. The government did not ask the jury to take Al-Assadi's words for their truthfulness nor would the jury have been misled by this single statement.

During its rebuttal to Jaffal's closing argument, the government said, after restating Al-Assadi's assertions, that "you hear clear attempts at [Al-Assadi] telling [Jaffal] that she's hiding evidence. Who knows what else she hid before the police got there or flushed down the toilet." But this single reference to Al-Assadi's own statement, even when combined with a hypothetical about what else Al-Assadi might have hidden, does not amount to the government using her statements to establish the truth of what she asserted.

The government simply reminded the jury about properly admitted testimony that was heard during the trial. Plus, as noted above, Al-Assadi's statements about hiding evidence gave context to Jaffal's own statements, in particular his admonition to Al-Assadi that she was supposed to "make sure nothing was in my pocket." The government's argument about hiding evidence was therefore not based on Al-Assadi's words alone because Jaffal also indicated a desire to keep things hidden. In conclusion, given the district court's clear instruction not to consider Al-Assadi's statements for their truthfulness, the government's rebuttal argument does not provide a basis for reversible error.

### b. *Statements about financial struggles*

Jaffal next argues that the government improperly relied on Al-Assadi's comments about financial struggles to contend, during its opening statement and closing argument, that the "financial insecurity provided a motive for Jaffal to deal drugs," and that this required accepting Al-Assadi's statements as true. But the government's main argument here is not that Al-Assadi's financial insecurity gave Jaffal a motive to deal drugs. Instead, the government argued, relying on Jaffal's own statements, that Jaffal likely distributed drugs because he told Al-Assadi that the solution to her financial problems was all of the money that he left "on the street" and the "product at the house." This was clearly a proper argument.

### c. *Statements about what the police found on Jaffal when he overdosed*

Finally, Jaffal argues that the government improperly "seized on Al-Assadi's words" when it "ask[ed] the jury to rely upon the distinction that [Al-Assadi makes] between 'the big baggy and the little personal.'" Jaffal's argument here is a bit perplexing because the fact that Jaffal was found with one large bag of drugs and one small bag of drugs was never in dispute. The government did not need to rely on Al-Assadi's words to prove this fact.

Instead, Jaffal seems to take issue only with the government's use of Al-Assadi's own terms ("big baggy" and "little personal"). But using Al-Assadi's own terms to describe the difference in the quantities of the drugs seized is not akin to using her words to prove their truth. Nor did the government "ask[] the jury to rely upon" Al-Assadi's distinction; it simply noted that Al-Assadi was making the same distinction that the government itself made between personal quantities and distribution quantities.

## C. Detective Kekic did not improperly provide expert testimony about Jaffal's state of mind

Jaffal further objected, both before and during trial, to all expert testimony sought to be elicited from Detective Kekic. The district court overruled Jaffal's objections after conducting a *Daubert* hearing. *See generally Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). It allowed Detective Kekic to testify as an expert under Fed. R. Evid. 702 because he was qualified

based on his extensive experience and because his expert testimony would aid the typical juror, who likely did not have sufficient knowledge of narcotics dealings. Jaffal does not object to this rationale, but argues on appeal that the court nonetheless abused its discretion because Detective Kekic allegedly testified about Jaffal's state of mind.

We review the district court's evidentiary decisions under the abuse-of-discretion standard and will reverse only if such abuse caused more than harmless error. *United States v. Warshak*, 631 F.3d 266, 324 (6th Cir. 2010). "An error is harmless 'unless it is more probable than not that the error materially affected the verdict.'" *Id.* (quoting *United States v. Martin*, 897 F.2d 1368, 1372 (6th Cir. 1990)).

Detective Kekic testified as both a fact witness (based on the personal knowledge that he gained from investigating the present case) and as an expert witness (based on his extensive experience as a narcotics investigator). The district court gave an instruction at trial about Detective Kekic's dual testimony as both a fact witness and as an expert witness, ultimately instructing the jury that it must give each its proper weight, that it could consider the credibility of Detective Kekic, and that it need not accept Detective Kekic's opinions.

Jaffal specifically takes issue with the following five statements made by Detective Kekic during trial:

> (1) After noting that he was assigned to Jaffal's case, Detective Kekic said that he read Jaffal's report and "put my investigative packet together" so that he could interview Jaffal. He next described that the goal of these interviews was to "get [suspects] to cooperate to maybe lead us to" drug distributors higher up in the chain. Detective Kekic then said, after learning about the case, that he "was investigating, in my eyes, a drug trafficking case at that point."
>
> (2) "I had noticed through that, through the details in the report, the quantity of the narcotics that were located, the fact that there was money that was involved that was confiscated, and cell phones[,] that I had deemed that this was probably a drug trafficking case with trafficking prepped for ship[ment] . . . ."
>
> (3) "Most of the time users only carry about a half a gram to a gram. So with that kind of quantity, it led me to, in my experience, [believe] that this was a drug trafficking situation. So people don't run around with 40 grams of heroin in their pocket and not know that's a substantial amount of heroin."

(4) In response to a question about how he tries to get a suspect to cooperate, Detective Kekic said: "The fact that that was a large amount. If it's a large amount, then that tends to put a little bit more pressure on the person because they know that they're looking at a substantial charge. Depending on the quantity would—you know, if it's over a certain bulk amount, it will raise the charge to a different level felony. And at this one I had looked at, with the amount of narcotics that were located, that we were looking at about an F2 or an F1 trafficking prep for ship[ment] as well as possession."

(5) When asked to describe the quantity of drugs in an exhibit, Detective Kekic said: "The larger quantity is more indicative of trafficking."

"Courts have overwhelmingly found police officers' expert testimony admissible where it will aid the jury's understanding of an area, such as drug dealing, not within the experience of the average juror." *United States v. Dunnican*, 961 F.3d 859, 876 (6th Cir. 2020) (emphasis removed) (quoting *United States v. Thomas*, 74 F.3d 676, 682 (6th Cir. 1996), *abrogated on other grounds as recognized by United States v. Barron*, 940 F.3d 903, 920 (6th Cir. 2019)). And law-enforcement officers are frequently allowed to offer expert testimony to explain various practices of drug trafficking. *See, e.g.*, *id.* at 875 ("Expert testimony regarding the very specific slang, street language, and jargon used in the illegal drug trafficking trade may be admitted under Federal Rule of Evidence 702."); *United States v. Combs*, 369 F.3d 925, 940 (6th Cir. 2004) ("[L]aw enforcement officers may testify concerning the methods and techniques employed in an area of criminal activity and to establish 'modus operandi' of particular crimes. Knowledge of such activity is generally 'beyond the understanding of the average layman.'" (quoting *United States v. Pearce*, 912 F.2d 159, 163 (6th Cir. 1990))).

Experts may not, however, testify that a particular criminal defendant possessed "the requisite mental state or condition constituting an element of the crime charged." *Combs*, 369 F.3d at 940 (citing Fed. R. Evid. 704(b)). The ultimate question is therefore "whether the expert actually referred to the intent of the defendant, or, instead, simply described in general terms the common practices of those who clearly do possess the requisite intent, leaving unstated the inference that the defendant . . . also possessed the requisite intent." *Dunnican*, 961 F.3d at 876 (quoting *Combs*, 369 F.3d at 940).

Based on the full context of Detective Kekic's testimony, we conclude that he did not improperly provide an opinion on Jaffal's state of mind. Law-enforcement officers are "routinely allowed to testify that circumstances are consistent with [the] distribution of drugs rather than personal use." *United States v. Swafford*, 385 F.3d 1026, 1030 (6th Cir. 2004) (collecting cases where this court has affirmed defendants' sentences when an officer testified that the facts were more consistent with distribution than with personal use). In all five of Detective Kekic's statements above, he was clearly stating his belief that, based on his experience, the evidence was more consistent with trafficking than with just personal use. Detective Kekic explicitly notes that he reviewed the investigative reports, that he interviewed Jaffal, and that there was a significant amount of drugs and money involved in the case. These details are precisely what supported Detective Kekic's belief that he was investigating drug trafficking.

True enough, drug trafficking requires as an element of the offense that the defendant possessed an intent to distribute. But Detective Kekic's belief that he was investigating drug trafficking is not the same as declaring that Jaffal had the intent to distribute drugs. Detective Kekic "left unstated" the ultimate question of Jaffal's mental state, instead noting only that the evidence was consistent with distribution, which is permissible. *See Dunnican*, 961 F.3d at 876 (citation omitted).

Jaffal primarily relies on *United States v. Warshak*, 631 F.3d 266 (6th Cir. 2010). But *Warshak*, a money-laundering case, is distinguishable because the expert there explicitly testified that certain transactions at issue were "done with an *intent to conceal*." *Id.* at 324 (emphasis in original). Such testimony was impermissible because it "spoke directly to the core issue of the requisite *mens rea*." *Id.* The same is not true here, where Detective Kekic never mentioned Jaffal's intent at all and instead noted only that the evidence was consistent with distribution.

**D. The district court erred in refusing to provide a lesser-included-offense instruction**

This brings us to the final issue of whether the district court abused its discretion when it denied Jaffal's request for a jury instruction on the lesser-included-offense instruction of simple drug possession. We review the court's denial of a request for a lesser-included-offense jury

instruction under the abuse-of-discretion standard. *United States v. Colon*, 268 F.3d 367, 373 (6th Cir. 2001). "To find an abuse of discretion, we must have a 'definite and firm conviction that the trial court committed a clear error of judgment.'" *Williams v. Eau Claire Pub. Schs.*, 397 F.3d 441, 445 (6th Cir. 2005) (quoting *Bowling v. Pfizer, Inc.*, 102 F.3d 777, 780 (6th Cir. 1996)).

Jaffal makes two arguments related to this issue: (1) that the district court applied the wrong standard when it denied Jaffal's request, and (2) that Jaffal was entitled to the instruction because a rational jury could have found reasonable doubt on the issue of intent to distribute. We address both of these arguments below.

### 1. The district court used the correct legal standard

To understand if the district court employed the wrong legal standard, one must first ascertain what the *right* standard is. The Supreme Court initially addressed this issue in *Stevenson v. United States*, 162 U.S. 313 (1896), where it announced a fairly low bar for providing the lesser-included-offense instruction, noting that even if the evidence of the greater offense is "simply overwhelming," as long as there was "some evidence relevant to the issue of [the lesser offense], the credibility and force of such evidence must be for the jury." *Id.* at 315. *See also Beck v. Alabama*, 447 U.S. 625, 635-36, 635 n.11 (1980) (noting that providing the lesser-included-offense instruction is an important procedural safeguard).

In *Keeble v. United States*, 412 U.S. 205 (1973), the Supreme Court expounded on the standard by noting that a defendant "is entitled to an instruction on a lesser included offense if the evidence would permit a jury rationally to find him guilty of the lesser offense and acquit him of the greater." *Id.* at 208. Such an instruction is important because, "[w]here one of the elements of the offense charged remains in doubt, but the defendant is plainly guilty of some offense, the jury is likely to resolve its doubts in favor of conviction." *Id.* at 212-13. In other words, if the jury is "not offered the so-called 'third option,' the jury is more likely to stretch to assign the defendant an 'unwarranted conviction.'" *United States v. LaPointe*, 690 F.3d 434, 439 (6th Cir. 2012) (quoting *Beck*, 447 U.S. at 637).

This court has determined that a lesser-included-offense instruction should be given if

> (1) a proper request is made; (2) the elements of the lesser offense are identical to part of the elements of the greater offense; (3) the evidence would support a conviction on the lesser offense; and (4) the proof on the element or elements differentiating the two crimes is sufficiently disputed so that a jury could consistently acquit on the greater offense and convict on the lesser.

*Id.* (quoting *Colon*, 268 F.3d at 373). The district court referenced this exact standard by citing *LaPointe* and *Colon* in its pretrial order on whether it would need to provide the lesser-included-offense instruction, as well as in its order denying Jaffal's motion for judgment of acquittal and a new trial. At trial, when ruling on whether to provide the requested instruction, the court specifically recited part (4) of the test from *LaPointe* because that was the only element in dispute. The district court's written and oral rulings thus show that it considered the correct legal standard.

In applying that standard, the district court concluded that the quantity of drugs was "overwhelming" evidence of intent, especially in conjunction with Jaffal's own admissions on the jail recordings, the large amount of cash, the possession of a weapon, his evasiveness while driving, and the potency of the drugs. In light of this evidence establishing intent, the court concluded that it "is not in sufficient dispute that Mr. Jaffal simply possessed." The court repeated this conclusion in its post-trial order denying Jaffal's motion for a new trial because "the evidence, as a whole, would not have allowed a rational jury to convict [Jaffal] of mere possession."

Jaffal is certainly correct, however, in noting that the district court made statements alluding to a misunderstanding. In particular, the court commented that if "the jury does buy [Jaffal's] theory of the case, he's looking at acquittal as opposed to conviction for possession without intent." But this type of reasoning is precisely what the Supreme Court warned against in *Keeble*:

> [I]t is no answer to a petitioner's demand for a jury instruction on a lesser offense to argue that a defendant may be better off without such an instruction. True, if the prosecution has not established beyond a reasonable doubt every element of the offense charged, and if no lesser offense instruction is offered, the jury must, as a theoretical matter, return a verdict of acquittal. But a defendant is entitled to a lesser offense instruction . . . precisely because he should not be exposed to the

substantial risk that the jury's practice will diverge from theory. Where one of the elements of the offense charged remains in doubt, but the defendant is plainly guilty of some offense, the jury is likely to resolve its doubts in favor of conviction.

412 U.S. at 212-13.

The district court's language also reveals a possible belief that Jaffal "may be better off without such an instruction" because the jury could have decided the disputed question of intent in Jaffal's favor, thereby acquitting Jaffal of the only drug charge that it was asked to consider. We note, moreover, that the court's comment about what would happen if "the jury does buy [Jaffal's] theory of the case" conflicts with its conclusion that the evidence of drug distribution was so "overwhelming" that no rational jury could decide otherwise.

The district court also determined that it "believe[d] the evidence in this case has been sufficient to show that Mr. Jaffal possessed with intent to distribute" the narcotics at issue. But asking only whether there is "sufficient" evidence of intent ignores the possibility that there is also sufficient evidence that Jaffal did *not* intend to distribute the narcotics; in other words, that the question of intent was *disputed*. The court instead needed to determine whether the element of intent was sufficiently in dispute "so that a jury could consistently acquit on the greater offense and convict on the lesser." *See LaPointe*, 690 F.3d at 439. This requires more than simply determining if there was "sufficient" evidence of intent. But despite some moments of uncertainty, the proper inquiry—whether Jaffal's intent was in "sufficient dispute"—seems to have ultimately driven the district court's decision.

### 2. *The district court abused its discretion in declining the lesser-included-offense instruction*

Despite recognizing the correct legal standard, the district court ultimately denied the lesser-included-offense instruction because it found the question of intent to not be sufficiently in dispute in light of the "overwhelming evidence" of drug quantity, Jaffal's own admissions on the jail recordings, the large amount of cash, the possession of a weapon, his evasiveness while driving, and the potency of the drugs. The court also noted that the jury would have had to "entirely disregard [Jaffal's] own words" to find that he did not intend to distribute.

But there was also evidence that Jaffal simply possessed the narcotics at issue and did not intend to distribute them. Chief among such evidence is the clear indication that Jaffal was a drug user himself. His Count 1 charge, after all, arose from the incident where the police found him passed out on the floor, nearly dead from a drug overdose. And the pill that caused Jaffal's overdose was the same type of pill at issue in Count 2. In fact, when Jaffal received these pills from Detroit, he was given instructions on how many he should take at one time, supporting that the pills were meant for Jaffal's personal use. Jaffal and Al-Assadi even had a plan prepared in the event that Jaffal overdosed—by keeping Narcan on the premises. Jaffal spoke of his addiction like he was "walking with the devil." There is no doubt that Jaffal was a drug user, including use of the very drugs at issue here.

The quantity of the drugs involved is also not as "overwhelming" as the district court claimed. There was approximately a 23-day supply of heroin at issue in Count 1, and only 27 pills for Count 2. Both the heroin and the pills were found in a single container (i.e., not individually packaged for resale). Plus, the purity of the heroin was never tested, making it even harder to ascertain just how much of a heroin supply the 35.69-gram mixture actually was. Although the drug quantity was certainly not minuscule, a jury would not have been irrational to think that a heavy drug user like Jaffal might purchase a few weeks supply at one time, especially given the unknown potency of the drugs.

True enough, Detective Kekic testified that the quantity of heroin would "usually" be inconsistent with personal use. But "usually" is not the same as "always," and he made this assertion without knowing the drug's potency in this case. Detective Kekic also based this assertion on his belief that heavy users usually do not have enough money to buy such a supply. But he never investigated Jaffal's sources of income and he acknowledged that Jaffal might have been paid in cash as a convenience-store clerk.

Nor do Jaffal's statements on the jail recordings point solely to the drugs in question. Al-Assadi tells Jaffal that the police found a "big baggy" and a "little personal" in his jacket pocket. As the conversation continued, Jaffal repeatedly stated that he was a drug user who overdosed, and Al-Assadi emphasized that the big baggy was "all personal" and that Jaffal "just like[s] to buy a big amount at one time and use it for personal." Jaffal agreed with Al-Assadi.

Using the district court's own words, the jury would have had to "entirely disregard" this conversation in order to find that Jaffal instead intended to distribute those narcotics.

There is also some evidence in the record that casts doubt on whether Jaffal's statements about handling "business" in Detroit was about the drugs at issue in this case. Jaffal never specifies what he means by "business," leaving the jury to fill in the gaps. THC vape pens were found in Al-Assadi's house, and Detective Kekic explicitly testified that vape and marijuana products often come from Detroit. Even the discussions between Jaffal and Al-Assadi about the money "left in the street" and the worth of the "product at the house" might have related to the distribution of the vape pens rather than to the distribution of the drugs in question. A jury might have been left with doubts about what Jaffal meant on the recordings.

The district court also noted the presence of a gun and the large amount of cash. But whether Jaffal even knew about the gun being in the car was disputed at trial. The renter of the car was the sole witness called by Jaffal, and he directly testified that he left the gun in the center console by accident. And the inference that Jaffal threw the gun from the car during the December 12, 2019 chase could be explained by the fact that even a simple drug user recognizes that being caught with a gun increases the odds of being charged as a drug distributor. We also note that there was testimony from Detective Kekic that Jaffal had a job as a convenience-store clerk and might have been paid in cash, thus explaining the presence of the cash. Finally, the court's finding of intent based on Jaffal's evasiveness while driving and the potency of the drugs is unpersuasive because these factors are just as applicable to a drug user as to a drug distributor.

The ultimate question for us is whether the district court abused its discretion in failing to give the lesser-included-offense instruction. A key precedent on this question is this court's decision in *United States v. Monger*, 185 F.3d 574 (6th Cir. 1999), in which the court reversed Monger's conviction because he should have received a lesser-include-offense instruction. *Id.* at 575. Monger was found during a traffic stop with $2,512 in cash and 10.66 grams of cocaine base on his person. *Id.* A search of the vehicle uncovered 1.3 grams of marijuana behind the air vent, 2.9 grams in the backseat, and 4.8 grams in a hidden compartment. *Id.* at 575-76. After obtaining a search warrant, the police also discovered a scale and a "corner of a plastic bag

containing marijuana seeds" in Monger's apartment, as well as a number of sandwich bags with missing corners in the community dumpster outside. *Id.* at 576.

The district court in *Monger* denied the requested lesser-included-offense instruction, but this court reversed. *Id.* at 576-77. In particular, this court noted that there was no evidence presented linking the scale or the sandwich bags to Monger, who lived with multiple people, one of whom had also been arrested on drug charges. *Id.* at 577. Further, the officer in *Monger* testified that "the drugs could have been for personal use or for distribution, but that he did not know Monger's intent." *Id.* Thus, despite the presence of large quantities of drugs, drug paraphernalia, and a large amount of cash, this court concluded that a rational jury could have found that the drugs were for personal use only and not for distribution, given the other evidence in the record. *Id.* In reaching its conclusion, the court emphasized that "a district court is not to weigh the evidence in determining whether to give a lesser included offense charge." *Id.*

Unlike in *Monger*, no drug-related paraphernalia was found *at all* in the case before us. Jaffal's possession of cash could be explained by his job as a convenience-store clerk. Although Detective Kekic was more direct in his belief that he was investigating a drug-distribution case than the officer in *Monger*, the jury was not required to accept Detective Kekic's testimony as true in light of the above evidence that Jaffal simply possessed the narcotics at issue.

There was also some evidence that Jaffal was distributing an unrelated controlled substance (the THC vape pens) and significant evidence that the narcotics at issue were only for Jaffal's personal use. To discount this evidence would be to improperly weigh the evidence, which is the province of the jury. *See id.*; *see also Stevenson v. United States*, 162 U.S. 313, 315 (1896) (noting that even in the face of "overwhelming" evidence of the greater offense, "so long as there was some evidence relevant to the issue of [the lesser offense], the credibility and force of such evidence must be for the jury").

Jaffal was certainly guilty of something—he did not even contest the fact that he possessed the drugs in question. But by not providing the lesser-included-offense instruction, the district court "force[d] the jury either to acquit the defendant or to find him or her guilty of the full offense. When not offered the so-called 'third option,' the jury is more likely to stretch to

assign the defendant an 'unwarranted conviction.'" *United States v. LaPointe*, 690 F.3d 434, 439 (6th Cir. 2012) (quoting *Beck v. Alabama*, 447 U.S. 625, 637 (1980)). Jaffal was therefore exposed to a "substantial risk" that the disputed element of intent would be resolved by the jury in favor of conviction. *See Keeble v. United States*, 412 U.S. 205, 212-13 (1973).

This is a closer case than most. But at bottom, the element of intent is sufficiently in dispute, and we are left with the definite and firm conviction that the district court abused its discretion by not providing the lesser-included-offense instruction. A jury might well find that Jaffal had the intent to distribute the drugs at issue, but that is a decision for the jury to make and not the district court. A contrary decision would not be "irrational" based on the record before us, even if it is one that we would not necessarily make ourselves.

## IV. CONCLUSION

For the reasons set forth above, we **AFFIRM** all of the district court's evidentiary rulings, **REVERSE** its failure to give the lesser-included-offense instruction, and **REMAND** for a new trial on Counts 1, 2, and 3.